H GRAPHICS/ACCESS, LTD. PARTNERSHIP, NELSON J. SAPP, JR., A PARTNER OTHER THAN THE TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
H Graphics/Access, Ltd. Partnership v. Commissioner
Docket No. 4298-88.
United States Tax Court
T.C. Memo 1992-345; 1992 Tax Ct. Memo LEXIS 367; 63 T.C.M. (CCH) 3148; June 15, 1992, Filed *367 An appropriate order will be issued. K, a partner in H Graphics, and R executed a "Settlement Agreement for Partnership Adjustments" (Form 870-P). Sec. 6224(c)(1), I.R.C., provides that a partnership settlement agreement is binding on all parties to the agreement absent fraud, malfeasance, or misrepresentation of fact. Sec. 6224(c)(2), I.R.C., further provides that R must offer consistent settlement terms to any other partner who so requests. After requests by other H Graphics partners for settlement terms consistent with those in K's settlement agreement, R repudiated the settlement with K contending that it had been procured by fraud, malfeasance, or misrepresentation of fact. Accordingly, R refused to offer consistent settlement terms to the other partners who requested consistent treatment. Held: In order to establish fraud, malfeasance, or misrepresentation of fact within the meaning of sec. 6224(c), I.R.C., the party making such allegations must prove that the execution of the settlement agreement was induced by intentional and deliberate misstatements or silence calculated to mislead or deceive. R has failed to prove that the settlement agreement with K was procured *368 by fraud, malfeasance, or misrepresentation of fact. Pursuant to sec. 6224(c)(1), I.R.C., the settlement agreement is binding and, under sec. 6224(c)(2), I.R.C., R must offer consistent settlement terms to all other partners who made timely requests for such settlement terms. George W. Connelly, Jr., Robert I. White, and Linda S. Paine, for petitioner. Richard T. Cummings and Melanie R. Urban, for respondent. RUWE
RUWE
MEMORANDUM OPINION RUWE, Judge: This case is before the Court on petitioner's motion for an order directing respondent to extend the terms of a settlement agreement to petitioner and other eligible partners pursuant to section 6224(c)(2). [1]Section 6224(c) provides in pertinent part: (c) Settlement Agreement. -- In the absence of a showing of fraud, malfeasance, or misrepresentation of fact -- (1) Binds All Parties. -- A settlement agreement between the Secretary and 1 or more partners in a partnership with respect to the determination of partnership items for any partnership taxable year shall (except as otherwise provided in such agreement) be binding on all parties to such agreement with respect to the determination of partnership items for such partnership *369 taxable year. * * * (2) Other Partners Have Right To Enter Into Consistent Agreements. -- If the Secretary enters into a settlement agreement with any partner with respect to partnership items for any partnership taxable year, the Secretary shall offer to any other partner who so requests settlement terms for the partnership taxable year which are consistent with those contained in such settlement agreement. * * * Basis for Motion
In November 1987, David S. Komiss, a partner in H Graphics/Access, Ltd., and respondent executed a Settlement Agreement for Partnership Adjustments (Form 870-P) with respect to partnership items of H Graphics/Access, Ltd., for the year ended December 31, 1983. Shortly thereafter, and pursuant to section 6224(c)(2), petitioner and various other partners of H Graphics/Access, Ltd., requested *370 settlement terms consistent with the terms in the Komiss agreement. Respondent refused to enter into settlements consistent with the terms in the Komiss agreement, alleging that the Komiss agreement was invalid because it had been procured by fraud, malfeasance, or misrepresentation of fact. Jurisdiction
We have jurisdiction to decide the issue presented by petitioner's motion. Pursuant to sections 6221-6233, the tax treatment of partnership items shall be determined at the partnership level. Section 6226 provides this Court with jurisdiction to determine partnership items. Section 6226(c) generally provides that each person who was a partner during a taxable year should be treated as a party to a judicial proceeding concerning that year. However, section 6226(d) excludes partners from being treated as parties after the partnership items of such partners become "nonpartnership items" by reason of one or more of the events described in subsection (b) of section 6231. Section 6231(b)(1)(C) provides that partnership items of a partner become nonpartnership items as of the date that "the Secretary enters into a settlement agreement with the partner with respect to such items". *371 Petitioner has taken the position that David S. Komiss is not a proper party because of his prior settlement. David S. Komiss has elected to participate in this case pursuant to section 6226(a)(2) and Rule 245(b). However, he also takes the position that if his settlement agreement is determined to be valid, he should be dismissed as a party. Thus, whether we have jurisdiction over David S. Komiss as a party is dependent upon whether a binding settlement was entered into. The same jurisdictional analysis is applicable to those partners who have made timely requests for settlement consistent with the Komiss settlement. If we find that the Komiss settlement is valid, those partners will be entitled to enter into settlements consistent with the Komiss settlement pursuant to section 6224(c) and, as a result of their settlements, would no longer be parties subject to our jurisdiction over the partnership items of H Graphics/Access, Ltd. We clearly have jurisdiction to determine the extent of our jurisdiction. Brannon's of Shawnee, Inc. v. Commissioner, 69 T.C. 999 (1978). [2]
*372 Background
Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. During 1983, petitioner Nelson J. Sapp, Jr., was a limited partner in H Graphics/Access, Ltd., a Texas limited partnership. He resided in Lafayette, Louisiana, when he filed his petition in this case. At that time, the principal place of business of H Graphics/Access, Ltd., was Houston, Texas. At all relevant times, the tax matters partner for H Graphics/Access, Ltd., was Paul D. Smith. H Graphics/Access, Ltd. (H Graphics or the partnership), was formed in November 1983. It was one of several partnerships formed to engage in different projects being developed by Microprocessor Laboratories, Inc. (MicroLabs). H Graphics had three general partners, Paul D. Smith, Robert Axelrod, and David S. Komiss. H Graphics timely filed its U.S. Partnership Return of Income (Form 1065) for taxable year 1983 with the Internal Revenue Service Center in Austin, Texas. The return reported a net ordinary loss of $ 4,279,950. In February 1986, respondent issued a notice of beginning of administrative *373 proceeding with respect to H Graphics' taxable year 1983. On October 8, 1987, respondent sent a notice of final partnership administrative adjustment (FPAA) to the tax matters partner determining disallowance of all expenses claimed by H Graphics. [3] The FPAA disallowed deductions that had been claimed on the partnership return in the amount of $ 4,280,428. This resulted in a determination by respondent that the partnership's distributable income was $ 532 instead of a loss of $ 4,279,950 as reported on the partnership return. A copy of the FPAA was sent to Mr. Komiss on November 2, 1987. The FPAA package received by Mr. Komiss included the notice *374 of final partnership administrative adjustment letter, a Form 870-P, and an additional schedule of adjustments with an attachment purporting to explain the reasons for the adjustments. The Form 870-P, titled "Settlement Agreement for Partnership Adjustments", contained terms governing the settlement offer and its acceptance, and explains the consequences of executing the form. The form makes it clear that it is the partner, not respondent, who must make the settlement offer and that there is no binding settlement until the offer is accepted by respondent. In pertinent part it provided: Under the provisions of section 6224(c) of the Internal Revenue Code, the undersigned offers to enter into a settlement agreement with respect to the determination of partnership items of the partnership for the year(s) shown on the attached schedule of adjustments. * * * This offer is subject to acceptance for the Commissioner of the Internal Revenue Service. It will take effect as a waiver of restrictions on the date it is accepted. Unless and until it is accepted, it will have no force or effect. If this offer is accepted for the Commissioner, the treatment of partnership items under this *375 agreement will not be reopened in the absence of fraud, malfeasance, or misrepresentation of fact; and no claim for refund or credit based on any change in the treatment of partnership items may be filed or prosecuted. The second page of the Form 870-P, which accompanied the FPAA, was also titled "Settlement Agreement for Partnership Adjustments" and contained a "Schedule of Adjustments" which had been filled in by the Internal Revenue Service and which reflected the following adjustments which were identical to respondent's determination in the FPAA: 12/31/83 Research & development
$ 4,125,000 Other expenses
155,482 Total adjustments to
$ 4,280,482 ordinary income   Ordinary income as reported
(4,279,950)
Corrected ordinary income
$ 532 Other Adjustments:
A. Tax preference items -- research & development
1. Adjustment
$ 4,125,000 2. As reported
4,125,000 3. Corrected
--    Had Mr. Komiss executed this Form 870-P "Settlement Agreement", it would have represented a complete concession of all issues raised in the FPAA. When Mr. Komiss received his FPAA package, he gave it to his tax lawyer, Thomas E. Redding. While Mr. Komiss is a lawyer, he is not *376 a tax lawyer, and he had never personally negotiated a settlement with the Internal Revenue Service. In 1987, approximately 50 percent of Mr. Redding's practice involved tax controversy work. He had negotiated a substantial number of settlements with the Appeals Division and district counsel during his years of practice. Mr. Redding suggested to Mr. Komiss that he submit his own offer of settlement on the Form 870-P. Mr. Redding advised Mr. Komiss that submitting his own offer was proper and in accordance with the printed terms of the Form 870-P. As of November 1987, respondent had not published any revenue procedures, announcements, or notices that explained the Form 870-P or procedures pertaining to it. Respondent's internal procedural guidelines were not generally available to the public. The only publicly available information, other than that contained in the FPAA package, was section 4433.1 of the Internal Revenue Manual, which provided: (5) If Form 870-P or 870-S, Settlement Agreement for TEFRA Partnership/S Corporation Adjustments, is received from any partner/shareholder it will be reviewed, accepted/approved and signed by the Chief, Quality Review staff/Chief, Examination *377 Suspense Unit in the service centers. A copy of each Form 870-P or 870-S accepted by the Service will be provided simultaneously to the TMP. Forms 870-P and 870-S will be returned to the key case service center. A schedule of adjustments for Mr. Komiss' offer was prepared at Mr. Redding's direction by his office staff. This schedule was a machine-made copy of the original pre-printed schedule on the Form 870-P that had accompanied the FPAA, except that the adjustment figures that had been filled in by respondent were deleted with correction fluid and new numbers typed in to reflect Mr. Komiss' offer. The new schedule reflected the following proposed adjustments for settlement purposes. 12/31/83
Research & development
$ 412,500 Other expenses
15,548 Total adjustments to
$ 428,048 ordinary income  Ordinary income as reported
(4,279,950)
Corrected ordinary income
($ 3,851,902)
Other Adjustments:
A. Tax preference items -- research & development
1. Adjustment  $ (412,500)
2. As reported  4,125,000 3. Corrected  $ 3,712,500 Mr. and Mrs. Komiss signed the Form 870-P which included their proposed settlement terms and mailed it, along with a cover letter *378 which Mr. Komiss signed, to respondent's Compliance Center in Austin, Texas. The cover letter stated: Enclosed is my Form 870-P, Settlement Agreement for Partnership Adjustments, relative to H Graphics/Access, Ltd. I understand from the terms of the form that it is an offer of settlement not binding until accepted by the Internal Revenue Service. As I would like to be able to file the appropriate amended tax returns and pay any interest due before year end, please return a completed copy to me as quickly as possible reflecting acceptance of it by the Internal Revenue Service. I look forward to having this matter settled. The TEFRA Branch at the Austin Compliance Center received Mr. Komiss' offer on November 19, 1987. The TEFRA Branch at Austin was established in 1986 to coordinate and administer the processing of partnership examinations. It was intended to act as the examination support unit for the district examination divisions throughout the Southwest. When a partnership return was selected for examination, the district's Examination Division sent a copy of the partnership return and the Forms K-1 to the Austin Compliance Center TEFRA Branch with a "linkage" request. *379 A linkage request was a request that all partners in the key case entity be determined. The TEFRA Branch then generated a notice of beginning of administrative proceeding (NBAP). Once the examination was complete, the Examination Division prepared the FPAA, including a schedule of adjustments, explanation of the adjustments, and the Form 870-P. The Examination Division would forward this package to the TEFRA Branch at Austin for duplication and mailing to the tax matters partner and other partners. The TEFRA coordinator at the Austin Compliance Center supervised the processing of FPAA's. At that time, 85 to 90 percent of the key cases and investor files were treated as tax shelters. The TEFRA coordinator reviewed the FPAA's and schedules of adjustments comparing them with the revenue agent's report, Form 886-Z, [4] and other relevant information relating to the results of each partnership examination. Once the TEFRA coordinator was satisfied that the figures in the FPAA and schedules of adjustment were consistent with the rest of the examination documentation, the package was forwarded to the clerical staff for mailing and other computer-related processing. *380 In November 1987, the TEFRA coordinator in the Austin Compliance Center was also performing the duties of settlement coordinator. The settlement coordinator's role was to review and process Forms 870-P received from taxpayers. In 1987, instructions on procedures for the review to be made by the settlement coordinator were oral. Upon receipt of a Form 870-P from a partner, the settlement coordinator reviewed the Form 870-P checking for signatures and obvious alterations. The coordinator also checked to make sure that the correct partner, partnership, and years at issue were indicated on the form. Sometimes, Forms 870-P would be received without the schedule of adjustments attached in which case they would be returned requesting that they be submitted with the schedule of adjustments. A "key case file" was maintained by the TEFRA Branch for each key partnership under examination. The file contained a copy of the partnership return, Schedules K-1, the NBAP, the FPAA sent to the tax matters partner, the Form 870-P, and the schedules prepared by the district offices. In addition, an investor file was maintained for each investor involved in each key case. The investor file contained *381 a copy of each investor's return, the FPAA, the Form 870-P, and the schedule of adjustments. In November 1987, the procedures followed by the settlement coordinator at the Austin Compliance Center did not include comparing incoming Forms 870-P with the copies of FPAA's and Forms 870-P which were retained in the files kept by the TEFRA Branch. During 1987, the Internal Revenue Manual did not require this as part of the review procedure, nor were there any other written or oral instructions requiring the settlement coordinator to make such a comparison. After ascertaining that a Form 870-P signed by a taxpayer was in proper form, the coordinator would execute it on behalf of the supervisor by using a signature stamp and initialing the document. The only time the coordinator compared the schedule of adjustments with documents in the files was when an investor struck out the amounts indicated on the schedule and applied his percentage of ownership in the partnership in order to reflect the dollar amount of the adjustments pertaining only to him. In these cases, the TEFRA coordinator would compare the Form 870-P to the investor's return and Schedule K-1. The Komiss settlement offer *382 did not receive expedited treatment at the Austin Compliance Center as requested in the cover letter. The volume of Forms 870-P prevented expeditious treatment even if specifically requested by a taxpayer. The settlement coordinator reviewed and executed Mr. Komiss' Form 870-P on November 24, 1987, as submitted. The coordinator did not compare the figures on the schedule of adjustments on the Form 870-P which had been submitted by Mr. Komiss with those contained on the schedules in the files of the TEFRA Branch. The fully executed Form 870-P was returned to Mr. Komiss by respondent on Saturday, November 28, 1987. On January 29, 1988, respondent sent a letter to Mr. Smith as tax matters partner, advising him that a settlement had been entered into with Mr. Komiss. A copy of the executed Komiss agreement on Form 870-P was attached to this letter. Respondent first became aware of the difference between the figures contained in the executed Form 870-P and the Form 870-P which accompanied the FPAA when another partner requested consistent settlement treatment. In a letter dated April 15, 1988, respondent notified Mr. and Mrs. Komiss that their settlement offer was rejected. That *383 letter stated: Dear Mr. & Mrs. Komiss: You recently submitted to us a Form 870-P proposing adjustments with respect to the above-referenced partnership. Based on information in our possession, we reject your offer of settlement and repudiate any agreement to settle based on your offer. We enclose herewith another original Form 870-P identical to the Form 870-P which we previously sent you. You may submit this offer if time remains for you to do so under the law. Please refer to our previous letter for the appropriate time limitation on this offer. Any other reply should be made directly to the "Person to Contact" identified in the letter you received previously with the Form 870-P. Thank you for your cooperation. Sincerely, Robert Ah Nee Director, Austin Compliance Center Discussion
The issue for decision is whether the Form 870-P signed by Mr. and Mrs. Komiss, and also signed on behalf of respondent, is a binding settlement agreement between Mr. Komiss and respondent. Section 6224(c) provides that settlement agreements in unified partnership proceedings are binding absent a showing of "fraud, malfeasance, or misrepresentation of fact". Form 870-P *384 explicitly states, and by executing the form the parties explicitly agree, that the settlement may not be set aside except upon a showing of "fraud, malfeasance, or misrepresentation of fact". All parties agree that these are the only grounds for setting aside the Form 870-P executed by Mr. Komiss and respondent. [5]
The standard that section 6224(c) prescribes for setting aside a settlement agreement is the same standard prescribed by section 7121(b) for setting aside a closing agreement. [6]Section 7121(a) authorizes respondent to enter into agreements in writing with any person relating to the liability of that person in respect to any internal revenue tax for any taxable period. Closing agreements are binding on the parties as to the matters agreed *385 upon and may not be annulled, modified, set aside, or disregarded in any suit or proceeding unless there is a showing of fraud, malfeasance, or misrepresentation of a material fact. Wolverine Petroleum Corp. v. Commissioner, 75 F.2d 593 (8th Cir. 1935), affg. 29 B.T.A. 1236 (1934); Estate of Magarian v. Commissioner, 97 T.C. 1, 5 (1991); Zaentz v. Commissioner, 90 T.C. 753 (1988). Mistakes of fact or law are excluded as grounds for rescission of a closing agreement. Wolverine Petroleum Corp. v. Commissioner, supra; Zaentz v. Commissioner, supra at 761. We will follow these same principles in applying section 6224(c). *386 The Internal Revenue Code does not define what constitutes fraud, malfeasance, or misrepresentation. Fraud has been interpreted to mean actual, intentional wrongdoing. It requires conduct intended to conceal or mislead. Webb v. Commissioner, 394 F.2d 366, 377-378 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Mitchell v. Commissioner, 118 F.2d 308 (5th Cir. 1941), revg. on another issue 40 B.T.A. 424 (1939); Katz v. Commissioner, 90 T.C. 1130, 1143 (1988); Wilson v. Commissioner, 76 T.C. 623, 633 (1981), supplemented by 77 T.C. 324 (1981); see Huene v. Commissioner, T.C. Memo. 1989-570, affd without published opinion 936 F.2d 577 (9th Cir. 1991); 12 S. Williston, Contracts, sec. 1487, at 326-327 (3d ed. 1970). A party establishes fraud for purposes of setting aside a closing agreement by showing that an alleged fraudulent representation (1) concerned material facts; (2) was knowingly false; (3) was made with the intention that it be relied on in good faith by the other party without knowledge of its falsity; and (4) proximately *387 caused injury or damage to the innocent party. Bennett v. Commissioner, T.C. Memo. 1988-557; see Boatmen's National Co. v. M.W. Elkins & Co., 63 F.2d 214, 216 (8th Cir. 1933); see also Marshall v. Hubbard, 117 U.S. 415, 417 (1886). "Malfeasance" is "The commission of some act which is positively unlawful; the doing of an act which is wholly wrongful and unlawful". Black's Law Dictionary 956 (6th ed. 1990). A "misrepresentation" is defined as "a false statement of a substantive fact, or any conduct which leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead." Id. at 1001; see Brinkman v. Commissioner, T.C. Memo. 1989-217. A misrepresentation sufficient to set aside a closing agreement pursuant to section 7121(b) requires a showing that one party intentionally made incorrect or misleading representations regarding the express terms reflected in the proposed closing agreement and that such representations were relied upon by the other party to its detriment. Phoenix Insurance Co. v. Commissioner, 29 B.T.A. 291 (1933); *388 see Bennett v. Commissioner, T.C. Memo. 1988-557. In Ingram v. Commissioner, 32 B.T.A. 1063, 1066 (1935), affd. 87 F.2d 915 (3d Cir. 1937), the Board of Tax Appeals stated: Obviously the use of the word misrepresentation denotes something more deliberate or more conscious than a mere error or mistake. Otherwise the entire rationale of a closing agreement would be lost. Congress intended that innocent mistakes should be buried in a closing agreement. * * * This still leaves an ample field for protection against an agreement founded in trickery or deception. * * * Based on the foregoing definitions, case law, and perceived congressional intent, [7] we hold that the terms "malfeasance" [8] and "misrepresentation" require a deliberate intent to deceive or mislead similar to that required to prove fraud. [9]
*389 The burden is on respondent to prove that the settlement agreement in issue was procured by fraud, malfeasance, or misrepresentation of fact. Ingram v. Commissioner, supra at 1064-1065. [10]
Petitioner asserts that the burden of proof required to establish fraud, malfeasance, or misrepresentation of fact within the meaning of sections 6224(c) and 7121(b) must be met by clear and convincing evidence and respondent does not disagree. However, we are not aware of, and neither party cited, specific authority for this proposition. Since we find that respondent has not proven *390 fraud by even a preponderance of the evidence, we find it unnecessary to decide this issue. [11]
*391 The only dispute between the parties is whether respondent was induced to enter the settlement agreement as a result of fraud, malfeasance, or misrepresentation of fact. More specifically, the dispute is over whether Mr. Komiss and Mr. Redding had the deliberate intent to deceive or mislead which we have found to be a necessary element of fraud, malfeasance, or misrepresentation within the meaning of section 6224(c). The existence of such intent is an issue that is peculiarly within the province of the trial court, see Helvering v. Kehoe, 309 U.S. 277 (1940), revg. 105 F.2d 552 (3d Cir. 1939) (which revd. 34 B.T.A. 59 (1936)), [12] and is a question of fact [13] to be resolved upon consideration of the entire record. See Kings Court Mobile Home Park, Inc. v. Commissioner, 98 T.C.     (1992); DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992). An intent to deceive or commit fraud is not to be imputed or presumed, but rather, must be established by some independent evidence. See Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989). Suspicion *392 is not enough. Kings Court Mobile Home Park, Inc. v. Commissioner, supra; Katz v. Commissioner, 90 T.C. at 1144. We have reviewed all the pertinent documents, heard testimony from the individuals who participated in the relevant events, and observed their demeanor on both direct and cross-examination. We, therefore, proceed to analyze the evidence. *393 Respondent contends that use of the Form 870-P to submit a settlement offer was deceptive in and of itself because both Mr. Komiss and Mr. Redding understood that the Form 870-P was intended for "settlement" only in accordance with respondent's adjustments in the FPAA and the Form 870-P schedule of adjustments that accompanied the FPAA. Had Mr. Komiss signed the Form 870-P with the adjustments as prepared by respondent, he would have offered to make a full concession and would have given his consent to assess any resulting tax liability. The Form 870-P in issue was entitled "Settlement Agreement For Partnership Adjustments", not "Concession" or "Consent to Assessment". The FPAA and the Form 870-P mailed to Mr. Komiss state that if the taxpayer signs and submits the Form 870-P, it constitutes the taxpayer's settlement offer and will have no force or effect until acceptance by respondent. The Form 870-P refers to itself as an "offer" by the taxpayer no less than a half dozen times. "Settlement", as that term is typically used in the context of tax controversies, is normally understood to mean a negotiated compromise. See sec. 601.106, Statement of Procedural Rules; Rev. Proc. 79-34, 1979-2 C.B. 498; *394 Saltzman, IRS Practice and Procedure, pars. 8.06[4], 9.07 (2d ed. 1991). Respondent acknowledges on brief that the title of the Form 870-P could be said to be misleading, but justifies this on the grounds that its draftsmen merely tracked the language of section 6224(c). Section 6224(c) provides rules for "settlement" agreements and specifically provides that if respondent enters into a "settlement agreement" with any partner, the same "settlement terms" must be offered to other partners upon request. While settlement agreements referred to in section 6224(c) may include total concessions by taxpayers, the term is not restricted to that meaning. A "settlement agreement" contemplated by section 6224(c) surely includes negotiated compromise settlements. It would have been superfluous for Congress to mandate that respondent offer consistent settlement terms for the sole purpose of allowing other partners to completely "concede" their cases. If respondent had intended that the use of the Form 870-P, which was mailed to Mr. Komiss, be restricted to making a full concession, that could have been made clear on the form. We note that the title of Form 870-P was subsequently changed *395 to "Consent to Assessment and Collection of Deficiency in Tax for Partnership Adjustments" and the term "settlement" was eliminated from the text of the form. Mr. Redding testified that he believed that it was appropriate to use Form 870-P as a vehicle for making a settlement offer in an amount less than respondent's proposed adjustments. Mr. Redding also testified that he advised Mr. Komiss of this and recommended that such an offer be sent to respondent's Austin Compliance Center. Mr. Redding testified that he suggested a settlement based on disallowance of 10 percent of the total deductions which respondent had disallowed in the FPAA. He testified that he viewed the 10-percent amount as an arbitrary figure intended to address a variety of problems including the amount of tax and interest liability that Mr. Komiss could live with. He also testified that he knew that other issues would remain unresolved by such a proposal, such as discharge of indebtedness income, phantom income, and additions to tax, and that the only way he would advise a client to settle partnership items without resolving related issues such as the potential future tax liability on phantom income and additions *396 to tax would be if the settlement was very favorable to the taxpayer on the front end. Mr. Redding testified that this was the first settlement offer (other than a full concession) that he had prepared on behalf of a client using a Form 870-P. He testified that he believed that the offer would be reviewed and could be accepted, but that based on his experiences in dealing with the Internal Revenue Service, he did not expect that Mr. Komiss' offer would be accepted. Mr. Redding testified that he hoped that the settlement offer would at least open up discussions and expedite the commencement of settlement negotiations. Mr. Komiss' testimony was consistent with Mr. Redding's. Respondent produced nothing to convince us that this testimony was false. Mr. Redding's testimony that he believed that it was appropriate to submit Mr. Komiss' settlement offer on a Form 870-P is consistent with the title and terms of Form 870-P. Respondent had released no guidance regarding the use of Form 870-P at the time the FPAA was sent to Mr. Komiss. The only publicly available information, other than that contained in the Form 870-P, was a section of the Internal Revenue Manual which contemplated *397 Government review of the Form 870-P prior to acceptance. Respondent's Assistant Commissioner (Examination) also appears to have taken the position that a Form 870-P could be used by taxpayers as a vehicle for proposing "settlements" that are something other than full concessions. On July 21, 1988, the Assistant Commissioner (Examination) of the Internal Revenue Service circulated a memorandum to the Assistant Regional Commissioners (Examination) stating: This office has received numerous telephone calls from the field requesting procedures with regard to taxpayer initiated and taxpayer modified TEFRA settlement agreements using Forms 870-P/S. An investor in a TEFRA entity may accept an offer, or make a counteroffer by submitting a Form 870-P/S. However, if the taxpayer makes a counteroffer by changing the Form 870-P/S [14] submitted to him/her, and that settlement is executed by personnel authorized to sign under Delegation Order #209, it will qualify in the absence of fraud, malfeasance, or misrepresentation of fact, as a settlement for purposes of IRC Section 6224(c). *398 In the event that an investor in a TEFRA entity initiates a settlement or modifies the language on Form 870-P/S, the receiving IRS office should not execute the agreement without checking the status of the key case on the Partnership Control System (PCS). The receiving office should notify the key case office of the receipt of a settlement offer from an investor. If a taxpayer initiated settlement agreement is mistakenly executed by the Service and the investor is notified of its execution, in the absence of fraud, malfeasance, or misrepresentation of fact, the Service will be bound by that agreement and under IRC Section 6224(c) must allow that same settlement position for all investors who request consistent terms within certain time constraints. In this circumstance, the responsible IRS officer for the key case should be notified. The responsible officer for the key case should contact District Counsel for appropriate case disposal procedures. Respondent contends that Mr. Redding engaged in fraudulent conduct because he knew or should have known that the Austin Compliance Center did not have the authority to "settle" a case on any basis other than the determination contained *399 in the FPAA. [15] Respondent has failed to offer evidence establishing that Mr. Redding had such knowledge or that it should be imputed to him. As part of the FPAA package, Mr. Komiss received a return envelope addressed to the Austin Compliance Center. The only thing in the FPAA package that could have been intended to be mailed back to the Austin Compliance Center was the Form 870-P "Settlement Agreement". Respondent argues that Mr. Komiss' cover letter requesting expeditious processing of his settlement offer was intended to be misleading and that there was no real reason to request expeditious treatment other than to mislead. Mr. Redding, who drafted the letter, testified that the cover letter requested quick processing of the offer because he believed that some action had to be taken within 150 days of when the FPAA was mailed *400 to the tax matters partner in order to avoid the necessity of participating in litigation, and so that interest on the tax due could be deducted in 1987. Mr. Redding testified that it was his experience that settlement documents, even those mutually agreed to, could take many months for the Internal Revenue Service to process. Respondent has not proven that Mr. Redding's explanation is false. Respondent finally contends that because the cover letter and Form 870-P failed specifically to indicate or highlight the differences between Mr. Komiss' offer and respondent's proposed adjustments, the settlement offer was purposely misleading. In support of this position, respondent analogizes the facts of the instant case with those of Huene v. Commissioner, T.C. Memo. 1989-570, and Herschler v. Commissioner, T.C. Memo. 1984-569. Both of these cases are distinguishable. In Huene v. Commissioner, supra, the Commissioner sent the taxpayer a Form 872A for the tax year 1978. Form 872A is a form that allows the period of limitations to be extended beyond the normal 3-year period. Rather than executing the original Form 872A, *401 the taxpayer typed, on his word processor, an entirely new consent to extend the period of limitations. This consent was almost identical to respondent's form. The taxpayer even purchased a daisy wheel that produced print similar to that on respondent's original form. He also selected the same spacing and margins so that the number of letters per line was equal to that on the original. He duplicated the consent in all respects except two. In the upper left-hand corner, he designated the Form to read "872M" rather than "872A". Also, in the middle of a full page of single-spaced text, he excised a sentence and replaced it with a similarly worded sentence limiting the assessable deficiency to "FIFTY DOLLARS". For all practical purposes, the $ 50 limitation made the extension meaningless. We found that it would have required "intense scrutiny" to have detected the change. The Commissioner did not notice the changes and executed the consent agreement. This Court held that the consent was invalid due to the taxpayer's fraudulent conduct, but that the taxpayers were estopped from asserting the defense of the statute of limitations against the Commissioner. In Herschler v. Commissioner, supra, *402 the Commissioner sent the taxpayer a Form 872 on August 5, 1980, which provided for extending the period of limitations until December 31, 1981. The date to which the Commissioner sought extension was printed at the top of each of the two pages and once in the text. The taxpayer changed "December 31, 1981" to December 31, 1980" by typing a "0" where the "1" had been. However, this change was made only to the date in the text, not to the date at the top of either of the pages. We characterized the change as "subtle" and "difficult to detect without extensive scrutiny." The taxpayer executed the Form 872 and returned it. The Commissioner executed the Form 872 without realizing that the date in the text had been altered. This Court concluded that the taxpayer intentionally misled the Commissioner. One of the factors upon which we relied was the taxpayer's prior modifications of Forms 872 and his experience with how the Commissioner dealt with such modifications. We held that the taxpayer was estopped from asserting the statute of limitations against the Commissioner despite the fact that the consent was invalid. In the instant case, the difference between respondent's adjustments *403 and Mr. Komiss' offer was not buried in a page of single-spaced text, nor did he alter some parts of the documents while leaving other inconsistent provisions unchanged. Mr. Komiss' offer consisted of an entirely different schedule of adjustments resulting in a net adjustment which was not similar to the original. The schedule of adjustments on the Form 870-P was brief and uncomplicated. Mr. Komiss was proposing to settle by agreeing to the disallowance of $ 428,048 of deductions that had been claimed on the partnership return. Corrected partnership income was determined by respondent to be $ 532, whereas Mr. Komiss was proposing a settlement based on a partnership loss of $ 3,851,902. A cursory comparison of the figures on Mr. Komiss' offer and the figures in the FPAA and the Form 870-P that accompanied it would have alerted respondent's settlement coordinator to the nature of the settlement offer. Respondent's settlement coordinator admitted at trial that had the schedules been compared, the differences would have been immediately obvious. Respondent has not shown that Mr. Redding had prior experience dealing with the Compliance Center that would have lead him to conclude *404 that settlement offers would be accepted without comparing them to respondent's FPAA determination. Mr. Redding testified that he did not intend to deceive respondent and expected that respondent's reviewing employee would be aware of respondent's position in the FPAA and readily see that Mr. Komiss' offer was not the same as the adjustment in the FPAA. Considering the terms used in the Form 870-P settlement offer, the finality which is ascribed to acceptance by respondent, the opportunity for consistent terms that must be given to other partners, and the amounts involved, we believe that it was reasonable to expect that respondent would review the schedule of adjustments in Mr. Komiss' settlement offer and compare those figures with the adjustments contained in the FPAA. We understand that respondent's procedures for processing Forms 870-P were relatively new in 1987. Nevertheless, as we have previously observed, "The universal admonition of reading a contract before executing it should apply to employees of the Internal Revenue Service." Schenk v. Commissioner, T.C. Memo. 1976-363; see Estate of Taft v. Commissioner, T.C. Memo. 1989-427. *405 [16]
*406 Respondent has failed to show that Mr. Redding or Mr. Komiss had any particularized knowledge of respondent's review process. Respondent has not shown that Mr. Redding or Mr. Komiss engaged in any affirmative conduct in the course of submitting the Form 870-P that was calculated to mislead or conceal, nor has respondent proven they had any knowledge that would make silence intentionally misleading. While we find that there has been no showing of intentional and deliberate intent to mislead or deceive which could support a finding of fraud, malfeasance, or misrepresentation, we believe it appropriate to express our view that taxpayers, their counsel, and representatives of the Internal Revenue Service ought to conduct themselves in a way that eliminates the undercurrents of suspicion that arose in this case. The suspicion generated by the events involved in this case could have been avoided by a more explicit explanation on behalf of Mr. Komiss when he transmitted his settlement offer. This Court will not countenance or reward conduct proven to have been deliberately calculated to take unfair advantage of another party's vulnerabilities. Where such intentional conduct is proven, *407 we are equipped to, and will, deal harshly with it. Such proof was not presented here. Rather, the facts presented to us in this case lead to the conclusion that the primary cause of respondent's dilemma can be traced to procedural defects in the processing of Forms 870-P during 1987. Contrast, for example, the procedures for processing closing agreements entered into pursuant to section 7121. Respondent has provided for detailed review of closing agreements in recognition of their finality. 5 Administration, Internal Revenue Manual (CCH), sec. 8(13)10, at 26,051 (Closing Agreement Handbook). Had such procedures been in place and followed when processing Forms 870-P at the Austin Compliance Center in 1987, the Komiss settlement offer presumably would not have been accepted. However unfortunate the result in this case may be for respondent, we can only relieve her from this agreement if the narrow statutory grounds for such relief have been proven. Respondent has failed to meet her burden of proof. We find that the Form 870-P settlement agreement executed by Mr. Komiss and respondent is binding on the parties thereto, and that pursuant to section 6224(c)(2), the H Graphics *408 partners who have made timely requests for consistent settlement treatment are entitled to the same settlement terms. An appropriate order will be issued.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year 1987, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The parties agree that if the Komiss settlement is valid, the terms of the Komiss agreement will be available to other partners who made timely elections to accept that agreement. A request for consistent settlement is timely if it is made not later than 150 days from the date the notice of final partnership administrative adjustment was mailed to the tax matters partner or 60 days from the date the settlement was entered into. Sec. 301.6224(c) -3T(c)(3), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6779-01 (Mar. 5, 1987). All but five partners of H Graphics/Access, Ltd., have made timely requests for settlement consistent with the terms of the Komiss settlement. Those five partners are not affected by this opinion. When all↩ partners in the partnership enter into the settlement agreement, Rule 248 provides for entry of decision in accordance with the settlement.
3. The FPAA was mailed within the period of limitations as extended by a special consent (Form 872-0). At the time the FPAA was mailed, respondent's examination of H Graphics had not been completed. The merits of respondent's determinations with respect to H Graphics' 1983 return are still in issue but were not considered for purposes of disposing of petitioner's motion.↩
4. Form 886-Z is a form which reflects how adjustments proposed at the partnership level will affect each individual partner. It is not part of the package sent to the individual partners.↩
5. Respondent argues on brief that these are the exclusive grounds for voiding a settlement agreement under sec. 6224(c) and that "contract law does not apply". See 5 Administration, Internal Revenue Manual (CCH), sec. 8(13)10, at 26,095 (Closing Agreement Handbook)↩.
6. Sec. 7121 provides: Sec. 7121. Closing Agreements. (a) Authorization. -- The Secretary is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period. (b) Finality. -- If such agreement is approved by the Secretary (within such time as may be stated in such agreement, or later agreed to) such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of material fact-- (1) the case shall not be reopened as to the matters agreed upon or the agreement modified by any officer, employee, or agent of the United States, and (2) in any suit, action, or proceeding, such agreement, or any determination, assessment, collection, payment, abatement, refund, or credit made in accordance therewith, shall not be annulled, modified, set aside, or disregarded.↩
7. H. Conf. Rept. 97-760, at 602 (1982), 1982-2 C.B. 600↩, 664. 8. Respondent argues that "malfeasance" should be equated with a violation of ethical standards applicable to attorneys. Respondent refers us to ABA comm. on Ethics and Professional Respondibility, Formal Op. 314 (1965), which states: In all cases, with regard both to the preparation of returns and negotiating administrative settlements, the lawyer is under a duty not to mislead the Internal Revenue Service deliberately and affirmatively, either by misstatements or by silence or by permitting his client to mislead. [Emphasis added.] It is clear that this opinion deals with a deliberate intent to mislead and respondent makes no argument to the contrary. See also 5 Administration, Internal Revenue Manual (CCH), sec. 8(13)10, at 26,095-4 (Closing Agreement Handbook) which provides: (3) The term "malfeasance" means violation of a public trust or guilt with respect to some form of official act. (4) The term "misrepresentation" when used as a ground for setting aside a closing agreement connotes intentional deceit. It does not refer to a mere mistake of fact or law, whether unilateral or mutual, no matter how material. * * * ↩
9. Fraud. An intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right. A false representation of a matter of fact, whether by words or by conduct, by false or misleading allegations, or by concealment of that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his legal injury. Anything calculated to deceive, whether by a single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or innuendo, by speech or silence, word of mouth, or look or gesture. Delahanty v. First Pennsylvania Bank, N.A., 318 Pa.Super. 90, 464 A.2d 1243, 1251. A generic term, embracing all multifarious means which human ingenuity can devise, and which are resorted to by one individual to get advantage over another by false suggestions or by suppression of truth, and includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated. Johnson v. McDonald, 170 Okl. 117, 39 P.2d 150↩. "Bad faith" and "fraud" are synonymous, and also synonyms of dishonesty, infidelity, faithlessness, perfidy, unfairness, etc. [Black's Law Dictionary 660 (6th ed. 1990).]
10. In Ingram v. Commissioner, 32 B.T.A. 1063, 1065 (1935), affd. 87 F.2d 915 (3d Cir. 1937), it was held that: the only rule consistent with the general statutory purpose of finality in closing agreements is that he who seeks to set one aside under the exception must prove the fact upon which the exception is conditioned. See Brinkman v. Commissioner, supra↩.
11. Common law actions for fraud have historically employed the clear and convincing evidence standard of proof, Lalone v. United States, 164 U.S. 255, 257 (1896); In re Braen, 900 F.2d 621, 625 (3d Cir. 1990), and the rule in this Court is that fraud with intent to evade tax must be proven by clear and convincing evidence. See Rule 142(b); Meier v. Commissioner, 91 T.C. 273, 298-299 (1988). However, two recent Supreme Court cases have held that securities fraud and bankruptcy fraud need be proven only by a preponderance of the evidence. See Herman & MacLean v. Huddleston, 459 U.S. 375 (1983); Grogan v. Garner, 498 U.S.    , 111 S. Ct. 654 (1991). The Supreme Court based these holdings on its interpretation of the particular statutes under consideration and the legislative objective for their enactment. We are not aware of any legislative objective behind the enactment of sec. 6224(c) to make it easier to prove fraud, or intentional and deliberate malfeasance, or misrepresentation. We have held that the standards of sec. 7121(b) regarding closing agreements are applicable to sec. 6224(c). The reason why the exceptions to the finality of closing agreements were limited to fraud, malfeasance, or misrepresentation was that Congress intended closing agreements to be final except in the most egregious circumstances. See Ingram v. Commissioner, supra.This Congressional objective of finality has been found to be so strong that a closing agreement remains binding even if the revenue statute under which the tax is assessed is later declared to be unconstitutional. Wolverine Petroleum Corp. v. Commissioner, 75 F.2d 593 (8th Cir. 1935), affg. 29 B.T.A. 1236↩ (1934).
12. In Kehoe v. Commissioner, 34 B.T.A. 59 (1936), the Board of Tax Appeals held that the Commissioner had proven taxpayer fraud regarding a final closing agreement. The Third Circuit reversed on the grounds that there was insufficient evidence supporting the Board's conclusion. 105 F.2d 552 (3d Cir. 1939). The Supreme Court, finding substantial evidence supporting the Board's findings, affirmed the findings of the Board and reversed the Third Circuit. 309 U.S. 277↩ (1940). 13. "The state of a man's mind is as much a fact as the state of his digestion". Cardozo, Law and Literature 18 (1931) (attributed to Lord Bowen).↩
14. We do not agree with the Assistant Commissioner's characterization of this situation as a "counteroffer". The Form 870-P made it clear that a settlement offer on Form 870-P was the taxpayer's offer, not respondent's, and that such offer was "subject to acceptance by the Commissioner" and that "unless and until it is accepted, it will have no force or effect".↩
15. Respondent makes no argument that the Komiss agreement is nonbinding because of the settlement coordinator's lack of authority to execute settlement offers on behalf of respondent.↩
16. This admonition is equally applicable to taxpayers. In Estate of Margarian v. Commissioner, 97 T.C. 1 (1991), the taxpayer argued that a closing agreement with respect to partnership adjustments for the year 1981 precluded the Commissioner from subsequently determining additions to tax related to those adjustments. The introductory language of the closing agreement stated that "the parties wish to resolve with finality the disputes with respect to the partnership". The specific partnership adjustments in the closing agreement made no reference to additions to tax related to the resulting deficiency. It was the Commissioner's policy that additions to tax not be included in such closing agreements. We observed that: Respondent might easily have dispelled any perception of unfairness in this case by bringing this policy to petitioners' attention at the time the terms of the closing agreement were negotiated. The possibility of the determination of additions to tax, after a TEFRA partnership closing agreement has been signed, creates an unnecessary trap for the unwary to which taxpayers should be alerted. [97 T.C. at 6.] Nevertheless, we held for the Commissioner on the grounds that the premises underlying a closing agreement are not part of the agreement itself and that if petitioners had intended to settle with respect to any of the possible additions to tax for the taxable year 1981, they should have insisted upon the inclusion of specific language to that effect in the closing agreement. * * * [97 T.C. at 6-7↩.]