# United States Tax Court

159 T.C. No. 3

CORY H. SMITH,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 5191-20.                                    Filed August 25, 2022.

————

P entered into a closing agreement with R under I.R.C. § 7121 waiving his right to elect to exclude foreign earned income under I.R.C. § 911(a) for the taxable years 2016–18. After filing his 2016 and 2017 returns without making the election, P filed amended returns making the election for those years, and R issued refunds in due course. P then made the election on his 2018 return.

Consistent with the closing agreement, R issued a notice of deficiency to P for the taxable years 2016–18 disallowing the elections under I.R.C. § 911(a). P petitioned this Court for redetermination of the deficiencies.

On competing Motions for Partial Summary Judgment, the parties dispute the validity of P's closing agreement. R asks this Court to hold that the agreement is valid under I.R.C. § 7121 and must be enforced. P, on the other hand, claims the agreement is invalid because the IRS official who executed it—the Director, Treaty Administration, in the IRS Large Business and International Division—did not have the authority to do so. In the alternative, P argues the closing agreement should be set aside under I.R.C. § 7121(b) because R committed malfeasance by disclosing confidential taxpayer information under I.R.C. § 6103 and because R

misrepresented material facts in the terms of the closing agreement.

*Held*: The closing agreement is valid and enforceable.

*Held, further*, the Director, Treaty Administration, had authority to execute the closing agreement on behalf of the Secretary.

*Held, further*, the closing agreement may not be set aside under I.R.C. § 7121(b) because P has failed to show malfeasance or misrepresentation of fact.

*Held, further*, R is entitled to partial summary judgment.

_____

*Tiffany Michelle Hunt*, for petitioner.

*Hannah Kate Comfort*, for respondent.

OPINION

TORO, *Judge*:  Petitioner, Cory H. Smith, entered into a closing agreement with the Commissioner pursuant to section 7121.[1]  There, Mr. Smith agreed to "irrevocably waive[] and forego[] any right that he . . . may have to make any election under Code section 911(a) with respect to income paid or provided to [him] as consideration for services performed for [his] employer at [the Joint Defense Facility at Pine Gap] in Australia" for the taxable years 2016, 2017, and 2018.  But, despite this undertaking and even though closing agreements are "final and conclusive" as to the matters agreed upon, I.R.C. § 7121(b), in an effort to avoid paying tax on this income either in the United States or in Australia, Mr. Smith filed federal income tax returns claiming the very benefits he had "irrevocably" waived and forgone.  Seeking to hold

_____

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Mr. Smith to the terms of the closing agreement, the Commissioner issued a notice of deficiency.

Mr. Smith challenges the notice of deficiency and asks us to ignore the closing agreement on two separate grounds. First, he claims that the agreement is invalid because the Director, Treaty Administration, at the IRS Large Business and International Division (LB&I), who signed it on behalf of the Commissioner, lacked the authority to do so. Second, he claims that, even if properly signed, the agreement should be set aside as contemplated by section 7121(b) because of malfeasance or misrepresentation of material fact by the Commissioner. The Commissioner resists Mr. Smith's claims and asks that we enforce the closing agreement. Both parties have moved for partial summary judgment.

After addressing some issues of first impression raised by Mr. Smith's claims, we conclude that his arguments lack merit and that the closing agreement must be enforced. Accordingly, we will grant the Commissioner's Motion for Partial Summary Judgment and deny Mr. Smith's competing Motion.

*Background*

To provide context for the issues before us, we begin with a brief introduction to the location where the controversy arose and an overview of the tax rules governing U.S. citizens working at that location.

I.    *Pine Gap Facility*

Seeking to expand their military intelligence capabilities during the Cold War, in 1966, the United States and Australia jointly established a surveillance facility located "where the scrubs and plains are wide," Henry Lawson, "Out Back," *in In the Days When the World Was Wide and Other Verses* 47 (1896)—that is, in the middle of the Australian Outback. The Joint Defense Facility at Pine Gap, Alice Springs, Northern Territory, Australia, as the facility is known today, is commonly referred to as "Pine Gap," and we will follow that convention.

Pine Gap's technical objectives are varied and complex and have evolved over time. For purposes of this Opinion, it suffices to note that the activities carried on there include the control of geosynchronous satellites to observe, collect, and process electronic signals data. *See generally* Anna Hood & Monique Cormier, *Can Australia Join the*

*Nuclear Ban Treaty Without Undermining ANZUS?*, 44 Melb. U. L. Rev. 132, 138–41 (2020) (describing Pine Gap and collecting resources).

Staffing Pine Gap requires that a substantial number of U.S. citizens move to Australia. The facility was maintained by approximately 400 personnel when it was first established, a number that was expected to increase over time. *See* Evidence to Joint Standing Committee on Treaties, Parliament of Australia, Canberra, Aug. 9, 1999, at 1 (Desmond John Ball).

## II. *U.S. Taxation of Pine Gap Employees*

### A. *General Principles*

Complex issues of international taxation arise whenever a U.S. citizen lives and works abroad.[2] Unlike most countries, the United States taxes the worldwide income of its nonresident citizens. *See, e.g.*, *Cook v. Tait*, 265 U.S. 47, 56 (1924); *Huff v. Commissioner*, 135 T.C. 222, 230 (2010). And this policy creates the potential for double taxation— that is, the taxation of the same income by both the United States and another country. *See AptarGroup Inc. v. Commissioner*, No. 7218-20, 158 T.C., slip op. at 3 (Mar. 16, 2022).

Domestic law provides some relief from double taxation for U.S. citizens working abroad, for example by providing a credit for taxes paid abroad. *See* I.R.C. § 901. Of particular relevance to this case is another domestic law provision, section 911(a). It permits qualified individuals to elect to exclude foreign earned income from their gross incomes and treats that income as exempt from U.S. federal income taxation.[3]

In addition to providing relief through domestic law, the United States often addresses potential issues of double taxation through agreements with other countries. For example, acknowledging that issues of double taxation arise in the ordinary course of exchanges between the two countries, the governments of the United States and Australia entered into a treaty governing the general avoidance of

---

[2] Because Mr. Smith is a U.S. citizen, our discussion focuses on the rules that apply to U.S. citizens. The Code and the treaties discussed below also provide relief for U.S. residents who are not citizens, but we do not address those rules further. *See, e.g.*, I.R.C. § 911(d)(1)(B) (describing requirements for U.S. residents who are not U.S. citizens).

[3] The terms "qualified individual" and "foreign earned income" are defined in section 911(d)(1) and (b)(1), respectively.

double taxation a little more than a decade before Pine Gap was established. *See* Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Austl.-U.S., May 14, 1953, 4 U.S.T. 2274 (1953 Treaty).

B.    *Pine Gap Agreements*

Despite the existence of the 1953 Treaty, concerns about double taxation received attention from the U.S. and Australian negotiators involved in establishing Pine Gap. The United States and Australia entered into two agreements governing the general operation of Pine Gap (Pine Gap Agreements), one in 1966 and another in 1969.[4]

As relevant to the issue of double taxation, the Pine Gap Agreements generally provide that the income U.S. citizens earn at Pine Gap will be deemed not earned in Australia, so long as it is actually taxed by the United States. Specifically, Article 9(1) of Pine Gap I provides that

> [i]ncome derived wholly and exclusively from performance in Australia of any contract with the United States Government in connection with the [Pine Gap facility or station] by any person . . . , who is in . . . Australia solely for the purpose of such performance, shall be deemed not to have been derived in Australia, provided that it is not exempt, and is brought to tax, under the taxation laws of the United States.

---

[4] The two agreements are called the Agreement Relating to the Establishment of a Joint Defence Space Research Facility, Austl.-U.S., Dec. 9, 1966, 17 U.S.T. 2235 (Pine Gap I), and the Agreement Relating to the Establishment of a Joint Defense Space Communications Station in Australia, Austl.-U.S., Nov. 10, 1969, 20 U.S.T. 3097 (Pine Gap II).

As their recitals indicate, these agreements were made pursuant to Article II of the Security Treaty Between Australia, New Zealand, and the United States of America, Sept. 1, 1951, 3 U.S.T. 3420, 3422, but are not treaties themselves. Instead, they are executive agreements made pursuant to a treaty. *See generally* Restatement (Second) Foreign Rel. § 119 (stating that, in general, executive agreements made pursuant to a treaty of the United States "may be coextensive with the treaty with regard to [their] scope and subject-matter" and have "the same effect and validity as the treaty").

17 U.S.T. at 2238. Pine Gap II contains a substantially identical provision. *See* Pine Gap II, art. X(1), 20 U.S.T. at 3100.[5] The undertakings reflected in the Pine Gap Agreements were incorporated into Australian domestic law.[6]

### C.  *1982 Treaty and Competent Authority Process*

In 1982, the United States and Australia entered into a new income tax treaty that superseded the 1953 Treaty. Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Austl.-U.S., Aug. 6, 1982, 35 U.S.T. 1999 (1982 Treaty).[7]

As relevant here, Article 4 of the 1982 Treaty provides rules for determining an individual's residency, *id.* at 2008–11; *see also* 2001 Protocol, art. 3, T.I.A.S. No. 13,164, and Article 15 sets out rules for the

---

[5] A similar provision appears in Article 6(1) of the Agreement Concerning the Status of United States Forces in Australia, Austl.-U.S., May 9, 1963, 14 U.S.T. 506, 511, and in Article 9(1) of the Agreement Relating to the Establishment of a United States Naval Communication Station in Australia, Austl.-U.S., May 9, 1963, 14 U.S.T. 908, 910.

[6] As relevant here, section 23AA(5) of the Australian Income Tax Assessment Act 1936 provides:

Where:

(a) a foreign contractor or a foreign employee has derived income wholly and exclusively from, or from employment in connexion with, the performance in Australia of a prescribed contract;

(b) the income is not exempt from income tax imposed by Chapter One of Subtitle A of the Internal Revenue Code of 1986 of the United States of America; and

(c) the foreign contractor or foreign employee was, at the time the income was derived, in Australia, or carrying on business in Australia, solely for prescribed purposes;

the income shall, for the purposes of this Act, be deemed to have been derived from sources out of Australia.

*Income Tax Assessment Act 1936* (Cth) s 23AA(5) (Austl.). The term "prescribed contract" includes the activities that take place at Pine Gap. *Id.* s 23AA(1).

[7] Unlike the Pine Gap Agreements, the 1982 Treaty is a treaty of the United States. 1982 Treaty, 35 U.S.T. at 2001. The 1982 Treaty was amended by protocol in 2001. *See* Protocol Amending the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Austl.-U.S., Sept. 27, 2001, T.I.A.S. No. 13,164 (2001 Protocol).

taxation of employees,[8] 35 U.S.T at 2037–38.  Article 15(1) states that, in general,

> salaries, wages and other similar remuneration derived by an individual who is a resident of one of the Contracting States in respect of an employment . . . shall be taxable only in that State unless the employment is exercised . . . in the other Contracting State.  If the employment is so exercised . . . such remuneration as is derived from that exercise . . . may be taxed in that other State.

35 U.S.T. at 2037.  Article 15(2) limits the reach of Article 15(1) in certain circumstances that are not relevant here.  In turn, Article 1(3) provides that, with exceptions that are not relevant here, "a Contracting State . . . may tax its citizens . . . as if this Convention had not entered into force."  *Id.* at 2002.

To put this in plain English and simplify a bit, under the 1982 Treaty, only the United States has the right to tax the compensation of an employee who is a U.S. resident and does not spend any time working in Australia.  But, if the same employee spends some of his time working in Australia and the limitations of Article 15(2) do not apply, he may be taxed by both the United States *and* Australia with respect to the compensation earned from working in Australia.  Applying these principles to U.S. citizens who earn income from working at Pine Gap without taking the Pine Gap Agreements into account, the 1982 Treaty would allow Australia to tax that income.[9]

However, the 1982 Treaty appears to have taken the Pine Gap Agreements into account.  Specifically, Article 1(2)(b) of the 1982 Treaty provides that "[t]his Convention shall not restrict in any manner any exclusion, exemption, deduction, rebate, credit or other allowance accorded from time to time . . . by any other agreement between the Contracting States."  *Id.* at 2001–02.  Thus, to the extent the Pine Gap Agreements are read as giving U.S. citizens working at Pine Gap more favorable treatment, the 1982 Treaty would seem to have left those arrangements intact.

---

[8] In the technical terms of the 1982 Treaty, the article governs the taxation of "Dependent Personal Services."

[9] U.S. citizens like Mr. Smith are treated as U.S. residents for purposes of the 1982 Treaty.  *See* 2001 Protocol, art. 3, T.I.A.S. No. 13,164.

One more 1982 Treaty provision is important here, Article 24. Article 24(1), 35 U.S.T. at 2051, gives taxpayers the right to seek competent authority assistance when they believe they are being taxed in a manner inconsistent with the treaty.[10] Article 24(2), in turn, authorizes the competent authorities of the United States and Australia to collaborate in resolving questions regarding the treaty's application. *Id.* at 2052. The provision states that

> [t]he competent authorities of the [United States and Australia] shall seek to resolve by agreement any difficulties or doubts arising as to the application or interpretation of this Convention. In particular the competent authorities . . . may agree:
>
> . . . .
>
> (c) to the same determination of the source of particular items of income; [and]
>
> (d) to the same meaning of any term used in this Convention . . . .

*Id.* The Treasury Department elaborated on the agreement process in its technical explanation of the 1982 Treaty:[11]

> [Article 24] provides for cooperation between the competent authorities to resolve problems of double taxation.
>
> . . . .

---

[10] "In recognition of the difficulties that may be encountered in [the] interpretation and application [of tax treaties], most tax treaties authorize a designated tax official from each nation, referred to as the 'competent authority,' to work together toward resolution of treaty disputes." Nancy H. Kaufman, *Dispute Resolution Under Tax Treaties: The Developing Role of the Competent Authority*, 3 Wis. Int'l L.J. 101, 112 (1984); *see also* 1982 Treaty, art. 3(1)(e)(i), 35 U.S.T. at 2005 (defining "competent authority" as "in the case of the United States: the Secretary of the Treasury or [her] delegate").

[11] We have found the Treasury Department's technical explanations of income tax treaties helpful in interpreting treaty provisions. *See Adams Challenge (UK) Ltd. v. Commissioner*, 154 T.C. 37, 66 (2020); *Garcia v. Commissioner*, 140 T.C. 141, 160 (2013).

> . . . [T]he competent authorities shall endeavor by mutual agreement to resolve any difficulties or doubts which may arise in the interpretation or application of the Treaty. For example, the competent authorities may agree . . . to the same determination of the source of particular items of income; [or] on a common meaning of a term . . . .

> . . . [The] competent authorities may communicate with each other directly for the purpose of reaching agreements in accordance with [Article 24].

Treasury Department Technical Explanation of the Convention Between the Government of the United States of America and the Government of Australia for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, 1986-2 C.B. 246, 257.

D.   *Need for Coordination on the Application of Section 911 to Pine Gap Employees*

For the United States and Australia, the relief provided under section 911 presented a particular problem in resolving issues of potential double taxation for U.S. citizens working at Pine Gap. As discussed, section 911 provides that certain qualified individuals may elect to exclude from gross income and exempt from U.S. federal income taxation certain foreign earned income.[12] But the Pine Gap Agreements provided that U.S. citizens could avoid Australian taxation on their Pine Gap income only if that income "is not exempt, and is brought to tax, under the taxation laws of the United States." *See* Pine Gap I, art. 9(1), 17 U.S.T. at 2238; Pine Gap II, art. X(1), 20 U.S.T. at 3100. And Australian domestic law similarly required that the relevant income not be "exempt from income tax imposed" in the United States for its sourcing recharacterization rule to apply. *Income Tax Assessment Act 1936* (Cth) s 23AA(5)(b) (Austl.). Moreover, the 1982 Treaty would appear to preserve the benefits of the Pine Gap Agreements only if those

---

[12] At the time Australia and the United States entered into the Pine Gap Agreements, section 911 provided for a mandatory exemption regime so long as its terms were satisfied. I.R.C. § 911(a) (1954) ("The following items *shall not* be included in gross income and *shall be* exempt from taxation . . . ." (Emphasis added.)). In 1981, Congress amended section 911, making its provisions elective for eligible taxpayers, Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, § 111, 95 Stat. 172, 190. This change presented novel issues for Australia and the United States in applying the 1982 Treaty, the Pine Gap Agreements, and Australian domestic law.

benefits are viewed as "any exclusion, exemption, deduction, rebate, credit or other allowance." 1982 Treaty, art. 1(2)(b), 35 U.S.T. at 2001–02.

To give effect to the terms of the 1982 Treaty, the Pine Gap Agreements, and Australian and U.S. domestic law, the United States and Australia needed a mechanism to ensure that income earned by U.S. citizens at Pine Gap would be "brought to tax" and "not exempt" in the United States and that the term "exempt" was applied consistently by both countries. A letter from an IRS official to an official at the U.S. Department of Defense, submitted by Mr. Smith in support of his Motion, described the efforts of the two countries to resolve the issue as follows:

> During 1983 and 1984, the United States and Australian competent authorities worked together to develop a procedure to apply the provisions of the Pine Gap Agreement to U.S. citizens working in [Pine Gap]. As a result of those joint consultations, the Australian Tax Office ("ATO") agreed that if an employee executes a closing agreement with the [IRS] stating that he or she will not claim the income exclusion available under section 911(a) of the [IRC], then he or she will not be liable to tax in Australia.

> The procedure ensures that income does not inappropriately escape taxation or become subject to double taxation. It further provides clarity, choice, and assurance for the employee as to where they want to be taxed—either (1) solely in the United States with a waiver of the IRC section 911(a) income exclusion, or (2) in both Australia and the United States, with double taxation being relieved by the United States through the IRC section 911(a) income exclusion or a foreign tax credit.

Letter from Nicole L. Welch, Program Manager, Treaty Assistance and Interpretation Team, IRS, U.S. Dep't of the Treasury, to John Turnicky, Hous. Program Manager, U.S. Dep't of Def. (Jan. 26, 2018) (Decl. of George Brown in Support of Pet'r's Reply to Response to Mot. for Partial Summ. J., Ex. C at 6–8) (Welch Letter).

In short, the two countries concluded that U.S. citizens working at Pine Gap would need to give up their election under section 911 to avoid being taxed in Australia, and they further agreed that an

employee who desired this result could achieve it by entering into a closing agreement with the IRS.[13]

For decades these procedures were followed by taxpayers and the tax authorities alike. As far as the interested parties were concerned, the closing agreements waiving U.S. taxpayers' right to elect under section 911(a) were sufficient to preempt potential issues of double taxation for U.S. citizens working at Pine Gap. But a few years ago, some U.S. citizens who worked at Pine Gap and had entered into closing agreements began ignoring the agreements and making the section 911(a) election on their tax returns or on amended returns they filed for earlier tax years.[14] Predictably, the Commissioner bristled at receiving these returns and issued notices of deficiency in respect of the section 911(a) elections.[15] This case is based upon one of these notices.[16]

## III.    *Mr. Smith's Case*

Having provided the preceding overview, we turn to the facts of this case. The facts below are derived from the pleadings, the parties' motion papers, their stipulation of facts as twice supplemented, and the declarations and exhibits attached thereto. These facts are stated solely for the purpose of ruling on the motions before us and not as findings of fact in this case. *See Whistleblower 769-16W v. Commissioner*, 152 T.C. 172, 173 (2019).

---

[13] We make no determination here whether a taxpayer in Mr. Smith's circumstances would or would not have been entitled to make an election under section 911 with respect to his income earned at Pine Gap absent a waiver.

[14] A recent decision from the U.S. Court of Appeals for the Federal Circuit addressed claims for refund filed by a taxpayer unrelated to Mr. Smith who also worked at Pine Gap and sought to avoid his obligations under a closing agreement waiving the section 911(a) election. *See Brown v. United States*, 22 F.4th 1008 (Fed. Cir. 2022). The decision did not reach the merits of the taxpayer's claim because the Federal Circuit concluded the claims for refund were not "duly filed" pursuant to section 7422(a). *Id.* at 1013.

[15] Counsel for the Commissioner advises the Court that at least 19 other cases pending in our Court involve the same issue as the one presented here.

[16] This is not the first time our Court has been called upon to address issues involving taxpayers working at Pine Gap. *See, e.g.*, *Middleton v. Commissioner*, T.C. Memo. 2008-150 (holding that the value of housing provided to Pine Gap employees by the United States Air Force must be included in the recipient's gross income); *Hargrove v. Commissioner*, T.C. Memo. 2006-159 (same).

A.    *Personal History and Employment With Raytheon*

Mr. Smith is an Air Force veteran and engineer who, in September 2009, received an offer of employment from the Raytheon Company, a private defense contractor, to work as an engineer at Pine Gap. After describing various contingencies that applied to the offer, the offer letter stated: "If you are currently employed, we recommend you wait until we advise you of the results of the physical, medical, and psychological screening, background check and visa processing before notifying your current employer of your decision to terminate your employment." The letter further stated:

> Please note that there are income tax implications associated with this overseas position . . . . You should consult with your personal tax preparer or advisor regarding these tax implications, and, upon your request, we will supply you information necessary for obtaining tax advice. Raytheon is not making any representations regarding the tax implications of this position.

After receiving Raytheon's offer, Mr. Smith temporarily moved to Dallas, Texas, to complete pre-employment orientation and onboarding processes. He ultimately accepted the offer.

While waiting to move to Australia, Mr. Smith received a copy of Raytheon's Australian Operations Overseas Handbook. The handbook informed Mr. Smith of certain tax implications of his new position, including that the Australian government would not assess income tax on Pine Gap employees provided that they waived their ability to elect the foreign earned income exclusion under section 911(a) in a closing agreement. The handbook stated that Raytheon employees had the option to choose not to sign a closing agreement. The handbook further explained that, if an employee decided not to sign a closing agreement, the Raytheon Payroll Center would be directed to withhold income tax at the Australian rate and forward the amounts withheld to the Australian Taxation Office. The handbook cautioned, though, that "tax laws change regularly and this information is provided as guidance only, [and] Raytheon strongly encourages you to contact a tax advisor with regard to your specific circumstances."[17]

---

[17] The handbook states as follows on the issue under our consideration:

Mr. Smith's onboarding took approximately one year. Once that process was complete, he moved to Pine Gap. On his first day of work there, Raytheon presented Mr. Smith with a form closing agreement between him and the Commissioner entitled "U.S. Treasury Department – Internal Revenue Service / Closing Agreement as to Final Determination Covering Specific Matters." The form closing agreement stated, in relevant part:

> Whereas, prior to the execution of this closing agreement, the said taxpayer voluntarily agrees to waive his . . . right

---

13.4 AUSTRALIAN TAX WAIVER POLICY

The Government of Australia has agreed, by treaty, not to render income tax assessments on U.S. contractor employees at JDFPG—provided they pay income tax to the U.S. Government and do not use the foreign earned income exclusion. Raytheon employees are strongly encouraged to sign a Closing Agreement with the IRS for each tax year they are assigned to JDFPG. The purpose of the Closing Agreement is an acknowledgment by the employee that the employee and the employee's spouse, if applicable, will continue to pay U.S. federal income tax for the period of his or her assignment and will not claim any exclusion under Internal Revenue Code Section 911 with respect to income derived from services performed for Raytheon at JDFPG. Note that the Closing Agreement applies only to income derived from services performed for Raytheon at JDFPG and not income derived from other Australian sources.

An employee may choose whether to submit an annual Closing Agreement for each tax year or to complete a Closing Agreement covering multiple tax years. If the agreement is submitted for multiple tax years, it cannot be altered during this time frame. The completed Closing Agreement is forwarded to the Internal Revenue Service for verification and acknowledgement. The IRS retains one copy of this form and returns the remaining forms to the Site Administration Office to be distributed as follows: employee, Australian Taxation Office and Raytheon.

If the employee elects not to sign a Closing Agreement, the Raytheon Payroll Center will be directed to withhold income tax at the Australian rate and forward those withholdings to the Australian Taxation Office. Australian tax rates are considerably higher than current U.S. tax rates. In addition to Australian taxes, U.S. social security taxes will be withheld and, in accordance with U.S. tax law, the employee's income will continue to be reported to the IRS and will be subject to U.S. income taxes (in addition to Australian income taxes) should the employee's income exceed the Section 911 exclusion limit.

Once again, tax laws change regularly and this information is provided as guidance only, Raytheon strongly encourages you to contact a tax advisor with regard to your specific circumstances.

to any election under Code section 911(a) for the . . .
[relevant] taxable period(s); and

Whereas, such waiver is pursuant to an agreement with
and a determination by the Competent Authority for the
United States after consultation with the Competent
Authority for Australia in accordance with Article 24 of the
[1982 Treaty] between the United States and Australia;

. . . .

Now it is Hereby Determined and Agreed for Federal
income tax purposes that:

(a)(1) the said taxpayer shall not at any time during or after
his . . . presence in Australia make any election under Code
section 911(a) with respect to income paid or provided to
said taxpayer as consideration for services performed for
[the employer] in Australia; and

(2) the said taxpayer irrevocably waives and foregoes any
right that he . . . may have to make any election under Code
section 911(a) with respect to income paid or provided to
[him] as consideration for services performed for [the
employer] in Australia . . . .

The form closing agreement concluded by stating, in relevant part:

[T]he said taxpayer and [the Commissioner] hereby
mutually agree that the matter so determined shall be final
and conclusive subject, however, to reopening in the event
of fraud, malfeasance, or misrepresentation of material
fact, and the required application of statutory provisions
expressly providing that effect be given thereto as stated
therein notwithstanding any law or rule of law other than
section 7122 of the Code . . . .

Despite the statements in the Raytheon handbook, Mr. Smith
maintains that Raytheon staff told him once he was in Australia that
his employment with Raytheon was contingent on his execution of the
agreement. For purposes of ruling on the Motions before us, we will
assume this assertion to be true. Mr. Smith also maintains that he did
not want to lose the job that he had been preparing to take for more than
a year, so he executed the first closing agreement, which covered taxable

years 2010, 2011, and 2012, on his first day of work. No IRS officials were present during Mr. Smith's discussions with Raytheon staff, and Mr. Smith did not communicate with any IRS officials before executing the agreement.

During his subsequent employment with Raytheon, Mr. Smith was presented with an identical closing agreement (except for the taxable years covered by the agreement) and asked to sign at least two more times. He signed each time, including in 2016, when he signed a closing agreement covering the taxable years 2016, 2017, and 2018 (2016–18 Closing Agreement).

As relevant here, the usual procedure for the execution of closing agreements by Raytheon employees was as follows. First, the IRS would send a blank form closing agreement via email to a program administrator Raytheon employed at Pine Gap. Next, the program administrator would provide the blank form closing agreement for completion and execution to each relevant Raytheon employee for the relevant taxable years. After the Raytheon employees completed and executed the agreements, the program administrator would transmit them back to the IRS via email. Once received by the IRS, the agreements would be reviewed and signed by an IRS official.[18] Finally, after the closing agreements were fully executed, the IRS would send copies directly to Raytheon for its own recordkeeping and for distribution to the individual employees and the Australian Taxation Office.

The usual process was followed with respect to the 2016–18 Closing Agreement. Mr. Smith signed that agreement on April 21, 2016. After Mr. Smith signed the agreement, he handed it back to his employer, and Raytheon transmitted the executed agreement back to the IRS. Deborah Palacheck signed the 2016–18 Closing Agreement on behalf of the Commissioner on May 12, 2017, in her official capacity as

---

[18] The particular official who would sign the closing agreements on behalf of the Commissioner varied from time to time. For instance, the closing agreement Mr. Smith signed covering the taxable years 2013–15 was signed by the Assistant Deputy Commissioner, International, while his 2016–18 Closing Agreement was signed by the Director, Treaty Administration.

Director, Treaty Administration.[19]  The IRS then sent the fully executed agreement back to Raytheon, which gave a copy to Mr. Smith.

### B.  *Tax Returns and Tax Court Proceedings*

Mr. Smith prepared his own Forms 1040, U.S. Individual Income Tax Return, for the taxable years 2016 and 2017.  He timely filed those returns reporting $122,051 and $116,381 in wages for services performed for Raytheon at Pine Gap.  Consistent with the terms of the 2016–18 Closing Agreement, Mr. Smith did not make an election under section 911(a) on his 2016 or 2017 return.

The Commissioner later received Forms 1040X, Amended U.S. Individual Income Tax Return, for Mr. Smith's taxable years 2016 and 2017.  In these amended returns, which were filed by a preparer located in the United States,[20] Mr. Smith claimed the section 911 foreign earned income exclusion with respect to the income earned while working for Raytheon at Pine Gap.  The IRS processed the Forms 1040X and issued refunds to Mr. Smith.

Mr. Smith's U.S. federal income tax return for the taxable year 2018 was filed by the preparer who filed his amended returns for 2016 and 2017.  In the 2018 return, Mr. Smith again claimed the section 911 foreign earned income exclusion with respect to the $141,810 he earned while working for Raytheon at Pine Gap.

After realizing that the elections on Mr. Smith's 2016 and 2017 amended returns and his 2018 return did not follow the undertakings

---

[19] Director, Treaty Administration, is a position within LB&I.  The Director's role is to assist the Director, Treaty and Transfer Pricing Operations Practice Area, in coordinating treaty administration across the IRS.  As relevant here, at the time the 2016–18 Closing Agreement was signed, the Director, Treaty Administration, reported to the Director, Treaty and Transfer Pricing Operations, who reported to the Commissioner, LB&I, who reported to the Deputy Commissioner for Services and Enforcement, who reported to the Commissioner of Internal Revenue.

[20] Mr. Smith did not sign the amended returns, which were prepared by John Anthony Castro.  Rather, Mr. Smith's counsel, Tiffany Michelle Hunt, who also represents Mr. Smith in this case, signed the returns on the lines designated for the taxpayer's signature.  The returns were not accompanied by a Form 2848, Power of Attorney and Declaration of Representative, as required by Treasury Regulation § 1.6012-1(a)(5) and Statement of Procedural Rules, 26 C.F.R. § 601.504(a)(6).  The IRS rejected them on that basis, and Mr. Smith then ratified the amended returns and refiled them.  The case mentioned at note 14 above, *Brown*, 22 F.4th 1008, also involved returns prepared by Mr. Castro, as do the cases mentioned at note 15 above.

made in the 2016–18 Closing Agreement, the Commissioner issued a notice of deficiency to Mr. Smith for the taxable years 2016, 2017, and 2018, disallowing the claimed section 911(a) elections and asserting that the previously issued refunds were in error. Mr. Smith timely petitioned this Court for redetermination of the deficiencies. At the time he filed his Petition, Mr. Smith lived in Australia.

In due course, the parties filed competing Motions for Partial Summary Judgment regarding the validity of the 2016–18 Closing Agreement. On May 24, 2022, the Court held a hearing on the Motions.

*Discussion*

I.     *Summary Judgment*

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). The Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the adverse party. *Sundstrand Corp.*, 98 T.C. at 520. However, the nonmoving party may not rest upon mere allegations or denials in his pleadings, but instead must set forth specific facts showing that there is a genuine dispute for trial. Rule 121(d); *see also Sundstrand Corp.*, 98 T.C. at 520.

II.    *Closing Agreements*

Section 7121(a) authorizes the Secretary to "enter into an agreement in writing with any person relating to the liability of such person . . . in respect of any internal revenue tax for any taxable period." The Code calls these agreements "closing agreements."

Section 7121(b) prescribes the effects of an agreement made pursuant to section 7121(a). If "approved by the Secretary," that agreement "shall be final and conclusive." I.R.C. § 7121(b). Lest there be any doubt as to the type of finality intended, as relevant to us, section 7121(b) goes on to provide that the agreement "shall not be annulled, modified, set aside, or disregarded" "in any suit, action, or proceeding." I.R.C. § 7121(b)(2). And to make doubly sure its meaning is not lost on the reader, the Code provides that this treatment extends

not just to the agreement itself, but also to "any determination, assessment, collection, payment, abatement, refund, or credit made in accordance" with the agreement. *Id.* As we have said: "Closing agreements are meant to insure the finality of liability for both the taxpayer and the IRS. This is why courts have strictly enforced closing agreements, finding them binding and conclusive on the parties . . . ." *Hopkins v. Commissioner*, 120 T.C. 451, 457 (2003) (quoting *Hopkins v. United States (In re Hopkins)*, 146 F.3d 729, 733 (9th Cir. 1998)).

As a general matter, a closing agreement is "approved by the Secretary" (and therefore "final and conclusive") once it is signed by the taxpayer and executed on behalf of the Secretary.[21] As described further in Discussion Part III.A below, the Secretary has delegated her authority to act in this regard to the Commissioner. The Commissioner's usual procedure is to accept (i.e., execute) a closing agreement only after a taxpayer or his representative has signed it. *See* Rev. Proc. 68-16, § 6.07, 1968-1 C.B. 770, 780. The Commissioner construes a taxpayer's prior signature as an offer to agree to the closing agreement and the Commissioner's subsequent execution as an acceptance of the taxpayer's offer to agree.[22] *Id.*

Section 7121(b) provides that the finality accorded a closing agreement can be avoided only "upon a showing of fraud or malfeasance, or misrepresentation of a material fact." And while closing agreements are similar in some respects to traditional contracts, our cases have made clear that the validity and enforceability of closing agreements are governed by the Code. *See Rink v. Commissioner*, 100 T.C. 319, 325 n.4 (1993) (stating that the determination of the validity or enforceability of a closing agreement is "subject solely to [section] 7121"), *aff'd*, 47 F.3d 168 (6th Cir. 1995); *see also Urbano v. Commissioner*, 122 T.C. 384, 393 (2004) (stating that section 7121 sets forth the exclusive means by which a closing agreement between the Commissioner and a taxpayer may be accorded finality) (citing *Hudock v. Commissioner*, 65 T.C. 351, 362 (1975)); *Marathon Oil Co. v. United States*, 42 Fed. Cl. 267, 274 (1998), *aff'd*, 215 F.3d 1343 (Fed. Cir. 1999).

---

[21] *See, e.g.*, *Steffler v. Commissioner*, T.C. Memo. 1995-271; *Smith v. Commissioner*, T.C. Memo. 1991-412.

[22] This construction aligns with section 7121, which contemplates a closing agreement becoming "final and conclusive" after it is "approved by the Secretary." I.R.C. § 7121(b).

Accordingly, courts have consistently held that once an agreement under section 7121(a) is "approved by the Secretary," it is "final and conclusive" unless a party can show that it should be set aside on one of the statutory grounds. *See* I.R.C. § 7121(b); *see also, e.g.*, *Wolverine Petrol. Corp. v. Commissioner*, 75 F.2d 593, 596 (8th Cir. 1935) ("Full consideration dictates that matters affecting the taxpayer's liability once concluded by a closing agreement should be respected in every particular, and subject to attack only upon the grounds enumerated in the statute."), *aff'g* 29 B.T.A. 1236 (1934). The effect of a closing agreement

> is regulated by statute and takes on legal consequences by virtue of the statute, and not under the law of contracts, but under well-settled principles of law which permit a sovereign state to control and designate when and under what conditions it may be sued. The legislative determination of these conditions is final, and is not dependent upon a consideration as in case of release of claims under the law of contracts.

*Perry v. Page*, 67 F.2d 635, 636 (1st Cir. 1933) (first citing *Aetna Life Ins. Co v. Eaton¸* 43 F.2d 711, 714 (2d Cir. 1930); and then citing *Bankers' Reserve Life Co. v. United States*, 42 F.2d 313, 316 (Ct. Cl. 1930)). Conditions not listed in the statute are not grounds for setting aside a closing agreement. *See, e.g.*, *Cramp Shipbuilding Co. v. Commissioner*, 14 T.C. 33, 37 (1950) (collecting cases); *see also Marathon Oil Co.*, 42 Fed. Cl. at 274 (stating that if section 7121 conflicts with the federal "common law" of contracts, the Code's provisions control).

III.     *Validity of the 2016–18 Closing Agreement*

There is no dispute that, under the 2016–18 Closing Agreement, Mr. Smith "irrevocably waives and foregoes any right he . . . may have to make any election under Code section 911(a) with respect to income paid or provided to [him] as consideration for services performed for [his] employer at [Pine Gap]" for the taxable years 2016, 2017, and 2018. And if the 2016–18 Closing Agreement is valid and the statutory exceptions do not apply, section 7121(b)(2) requires us not to "annul[], modif[y], set aside, or disregard[]" the agreement or any "determination . . . made in accordance therewith." Moreover, Mr. Smith does not dispute that the determinations reflected in the notice of deficiency with respect to the application of section 911(a) were "made in accordance" with the 2016–18 Closing Agreement. *See* I.R.C. § 7121(b)(2).

Rather, Mr. Smith offers a two-pronged attack on the 2016–18 Closing Agreement. He contends first that the 2016–18 Closing Agreement was not properly "approved by the Secretary" and second that, even if it was properly approved, it must nevertheless be set aside because of "malfeasance" or "misrepresentation." We take each contention in turn.[23]

### A. *Proper Approval of the 2016–18 Closing Agreement*

As to the approval point, Mr. Smith contends that the IRS official who signed the 2016–18 Closing Agreement—Ms. Palacheck, the Director, Treaty Administration—lacked the requisite signature authority. For the reasons described below, we resolve this issue of first impression in favor of the Commissioner.

### 1. *Applicable Rules*

The Code confers upon the Secretary the authority to enter into closing agreements. I.R.C. § 7121. Section 7701(a)(11)(B) defines the term "Secretary" to mean "the Secretary of the Treasury or [her] delegate." Section 7701(a)(12)(A)(i) defines the term "or [her] delegate"—when used with reference to the Secretary of the Treasury— to mean "any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly *by one or more redelegations of authority*, to perform the function mentioned or described in the context." (Emphasis added.)

Exercising the authority that sections 7121 and 7701(a)(11)(B) provide, the Secretary has delegated her authority to enter into closing agreements to the Commissioner. Treas. Reg. §§ 301.7121-1(a), 301.7701-9(b); *see also* Treas. Order 150-07 (Nov. 18, 1953) (transferring the Secretary's closing agreement functions to the Commissioner), *modified and superseded by* Treas. Order No. 150-10 (Apr. 22, 1982). The Commissioner, in turn, has further delegated his authority through regulations and delegation orders. Statement of Procedural Rules, 26 C.F.R. § 601.202(a)(1).[24]

---

[23] In his Petition, Mr. Smith argues that the 2016–18 Closing Agreement should be set aside because he signed it under duress. As explained in Discussion Part III.B.3 below, he has forfeited any duress arguments by not fully briefing them.

[24] Referring to section 7121, the rule states that "any officer or employee of the [IRS] authorized in writing by the Commissioner, may enter into and approve a written

As relevant here, Delegation Order 4-12 addresses the "Authority to Act as 'Competent Authority' or 'Taxation Authority' Under Certain International Agreements, Authorize the Disclosure of Tax Information Under Mutual Legal Assistance Treaties, and Disclose Certain Tax Convention Information." Delegation Order 4-12 (Rev. 3), Internal Revenue Manual (IRM) 1.2.43.12 (Sept. 7, 2016).[25] It delegates to the Commissioner, LB&I, the authority "[t]o act as 'competent or taxation authority' . . . *for all matters encompassed by the tax treaties* . . . of the United States . . . and to apply and to interpret such treaties . . . , but in matters of interpretation to act only with the concurrence of the Associate Chief Counsel (International)." IRM 1.2.43.12(2) and (3) (Sept. 7, 2016) (emphasis added). The delegation order requires that this authority "not be redelegated." *Id.* at (4).

Although the Commissioner, LB&I, may not redelegate the authority provided to him under Delegation Order 4-12, the delegation order itself delegates a portion of the authority provided to the Commissioner, LB&I, to other IRS employees, including the Director, Treaty Administration. Thus, the order reads as follows:

> **Authority:** To act as "competent authority" . . . under the tax treaties . . . of the United States with respect to specific applications of such treaties . . . , *including signing* mutual and *other agreements on behalf of the Commissioner, LB&I*, except as otherwise specifically delegated in this delegation order.
>
> . . . **Delegated to:** Director, Advance Pricing and Mutual Agreement and Director, Treaty Administration, for cases and issues under their jurisdiction.

IRM 1.2.43.12(14) and (15) (Sept. 7, 2016) (emphasis added).

The Commissioner maintains that the paragraphs of Delegation Order 4-12 set out above authorized Ms. Palacheck, as Director, Treaty

---

agreement with a person relating to the liability of such person . . . in respect of any internal revenue tax for any taxable period." Statement of Procedural Rules, 26 C.F.R. § 601.202(a)(1).

[25] Delegation Order 4-12 has since been revised. *See* Delegation Order 4-12 (Rev. 4), IRM 1.2.2.5.11 (June 9, 2021), *superseding* Delegation Order 4-12 (Rev. 3), IRM 1.2.43.12 (Sept. 7, 2016).

Administration, to execute the 2016–18 Closing Agreement with Mr. Smith. As explained further below, we agree.

2. *Analysis*

Whether Delegation Order 4-12 authorized the Director, Treaty Administration, to enter into the 2016–18 Closing Agreement on behalf of the Commissioner is a question of law appropriate for summary adjudication. *See* Rule 121(b); *Sundstrand Corp.*, 98 T.C. at 520.

The Director, Treaty Administration, is an official within LB&I who assists the Director, Treaty and Transfer Pricing Operations Practice Area, in coordinating treaty administration across the IRS. *See* discussion accompanying note 19 above. Consistent with that role, Delegation Order 4-12 granted the Director, Treaty Administration, the authority to act as "competent authority" under the tax treaties with respect to specific applications of such treaties, including the authority to sign "other agreements" on behalf of the Commissioner, LB&I. In our view, Ms. Palacheck, as Director, Treaty Administration, acted within her delegated authority when she signed the 2016–18 Closing Agreement because she was acting as competent authority with respect to a specific application of the 1982 Treaty.

a. *Ms. Palacheck's Actions*

To begin with, the 1982 Treaty provides general rules that apply to U.S. residents[26] who earn income while working in Australia and generally permits Australia to tax such individuals. *See* 1982 Treaty, arts. 4, 15, 35 U.S.T. at 2008–11, 2037–38. But the Pine Gap Agreements and Australian law implementing the Pine Gap Agreements would appear to provide for a different outcome. *See* Pine Gap I, art. 9(1), 17 U.S.T. at 2238 (providing that income earned by U.S. residents at Pine Gap is exempt from Australian taxation); Pine Gap II, art. X(1), 20 U.S.T. at 3100 (same); *Income Tax Assessment Act 1936* (Cth) s 23AA (Austl.) (same).

Determining the appropriate result for a taxpayer in Mr. Smith's position, therefore, required an analysis of how the 1982 Treaty interacts with the Pine Gap Agreements and Australian law— including, for example, whether the 1982 Treaty might be viewed as overruling the Pine Gap Agreements, *see Owner-Operator Indep. Drivers*

---

[26] As we have stated, U.S. citizens (such as Mr. Smith) are U.S. residents for purposes of the 1982 Treaty. 2001 Protocol, art. 3, T.I.A.S. No. 13,164.

*Ass'n, Inc. v. U.S. Dept. of Transp.*, 724 F.3d 230, 233 (D.C. Cir. 2013) (stating that when two treaties conflict, the more recent pronouncement controls), and, if not, how the terms "exempt" or "exemption" as used in section 911, the Pine Gap Agreements, Australian domestic law, and the 1982 Treaty should be applied. Put another way, the relevant legal authorities—the Pine Gap Agreements, U.S. and Australian domestic law, and the 1982 Treaty—gave rise to questions of proper application.

In these circumstances, Article 24(2) of the 1982 Treaty expressly authorized—indeed, it directed—the competent authorities of the two countries "to resolve by agreement *any difficulties or doubts* arising as to the application" of the 1982 Treaty. (Emphasis added.) They did so, as the Welch Letter explains, *see* Welch Letter at 2, Background Part II.D above, and as the parties do not dispute.[27] Specifically, the two competent authorities agreed to resolve the "difficulties or doubts" encountered in applying the 1982 Treaty by establishing a process under which (1) the IRS would enter into closing agreements with U.S. citizens who worked at Pine Gap providing for the relinquishment of the right to make an election under section 911 and (2) the Australian Taxation Office would in effect relinquish Australia's right to tax income earned in its territory once the closing agreements were in place. Additionally, receipt of a closing agreement would relieve the relevant Pine Gap employer from any obligation to withhold tax under Australian law. *Cf.* Rev. Proc. 2015-40, § 2.01(2), 2015-35 I.R.B. 236, 240 (recognizing that the mutual agreement procedure articles of U.S. tax treaties may be triggered by "foreign-initiated actions (such as withholding of tax by a withholding agent)").

Reflecting this history, one of the recitals of the 2016–18 Closing Agreement explains that waiver of Mr. Smith's rights under section 911 "is pursuant to an agreement with and a determination by the Competent Authority for the United States after consultation with the Competent Authority for Australia in accordance with Article 24 of the [1982 Treaty]." We agree with the recital and find it beyond question that implementing the arrangement described above required Ms. Palacheck to "act as 'competent authority' . . . under the tax treaties . . . of the United States with respect to specific applications of such

---

[27] While we do not rely on this point, we note that the IRS's website states that the IRS drafted its public guidance for Pine Gap employees in coordination with the Australian Taxation Office. *Foreign Earned Income Exclusion and the Pine Gap Facility*, https://www.irs.gov/individuals/international-taxpayers/foreign-earned-income-exclusion-and-the-pine-gap-facility (last updated Feb. 15, 2022).

treaties" under Delegation Order 4-12. Moreover, because the arrangement called for the signing of a closing agreement on behalf of the United States in appropriate circumstances, that action was also covered by the delegation order as an act required with respect to a specific application of the 1982 Treaty.

In view of the foregoing, we conclude that (1) Ms. Palacheck signed the 2016–18 Closing Agreement while acting as the competent authority under the 1982 Treaty with respect to a specific application of that treaty and (2) that action is well within the scope of the authority delegated to her as Director, Treaty Administration.

b. *Mr. Smith's Arguments*

Mr. Smith advances three principal arguments to resist our conclusion. We find them unavailing.

First, Mr. Smith questions whether a closing agreement is contemplated by the phrase "other agreements" in paragraph 14 of Delegation Order 4-12. *See* IRM 1.2.43.12(14). Pointing to the definition of "competent authority resolution" in IRM Exhibit 4.60.2-1 (Aug. 9, 2021), he argues that "other agreements" must extend only so far as to encompass certain types of "mutual agreements." But we disagree.

To begin, we note that the IRM exhibit Mr. Smith cites did not exist at the time Ms. Palacheck signed the 2016–18 Closing Agreement. Thus, we do not see how a definition included in that exhibit sheds any light on the proper interpretation of Delegation Order 4-12 as in effect at the time relevant here.

Moreover, although delegation orders do not carry the force of law, they are interpreted using principles of statutory construction. *See Crowell v. United States (In re Crowell)*, 305 F.3d 474, 478 (6th Cir. 2002). Those principles require us to interpret undefined terms in the delegation order "in their ordinary, everyday sense." *See Fort Howard & Subs. v. Commissioner*, 103 T.C. 345, 351–52 (1994) (citing *Commissioner v. Soliman*, 506 U.S. 168, 174 (1993)), *supplemented by* 107 T.C. 187 (1996); *see also Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019). As relevant here, the term "other" means "[d]ifferent from that or those implied or specified." *Other*, *The American Heritage Dictionary of the English Language* (5th ed. 2016); *see also Other*, *Webster's New World College Dictionary* (5th ed. 2016). Accordingly, we read the delegation order's reference to "other agreements" as referring to agreements different from mutual

agreements.[28] And consistent with this interpretation, we conclude that Delegation Order 4-12 is sufficiently broad to encompass the execution of an agreement—mutual or otherwise—that arises directly from the application of a "tax treat[y] . . . of the United States." The 2016–18 Closing Agreement falls within that description.[29]

Second, Mr. Smith objects to this conclusion by suggesting that the Director, Treaty Administration, has the authority to execute closing agreements, but only when a taxpayer makes a formal competent authority request pursuant to Article 24 of the 1982 Treaty and section 2.01 of Revenue Procedure 2015-40. Pet'r's Mot. for Partial Summ. J. 24. This point misses the mark. There is no textual foundation in Delegation Order 4-12 for the distinction Mr. Smith draws. Rather, all closing agreements signed by the Director, Treaty Administration, when acting as competent authority with respect to a specific application of a treaty, whether made in the course of a formal competent authority request or otherwise, fall within the ambit of "other agreements." IRM 1.2.43.12(14). Or, put another way, if the Director, Treaty Administration, has the authority to execute closing agreements in some circumstances involving a specific application of a treaty, she has the authority to execute closing agreements in any circumstance relating to specific applications of a tax treaty of the United States.[30]

---

[28] This reading is supported by the canon against superfluity. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001))). While Mr. Smith's interpretation would relegate the phrase "other agreements" to a subset of "mutual agreements" with no independent significance, our reading gives meaning to both phrases.

[29] The absence of the qualifier "closing" before the word "agreement" in the delegation order is of no moment. After all, the text of section 7121(a) itself refers only to "an agreement," and section 7121(b) refers to "such agreement" or "the agreement." Only the heading of that provision refers to a "closing" agreement. *See* I.R.C. § 7806(b) (stating that no "descriptive matter relating to the contents of [the Code] [shall] be given any legal effect"); *see also Rowen v. Commissioner*, 156 T.C. 101, 112 n.9 (2021) (first citing *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 222–23 (1996); and then citing *N.Y. & Presby. Hosp. v. United States*, 881 F.3d 877, 886 n.13 (Fed. Cir. 2018) ("[T]itles [in the Code] have no legal effect . . . .")). The reference to "other agreements" in Delegation Order 4-12 is more than sufficient to cover the circumstances here.

[30] Perhaps having recognized the tenuousness of her argument, Mr. Smith's counsel appeared to reverse her initial position, arguing at the hearing that the

Third, Mr. Smith further objects to our reading of Delegation Order 4-12 on the ground that, as he sees it, delegations of authority to enter into closing agreements are contained exclusively within Delegation Order 8-3, IRM 1.2.2.9.3 (July 27, 2022),[31] as described in part 8 of the Internal Revenue Manual. *See* Pet'r's Resp. to Mot. for Partial Summ. J. 5 (citing IRM 8.13.1.2.4.1 (May 25, 2018) (discussing certain delegations of authority to enter into closing agreements)). "It would not be practical," he urges, "for the IRS to . . . authorize . . . [the] Director, Treaty Administration, to also execute closing agreements through a different [d]elegation [o]rder" contained in another section of the Internal Revenue Manual. Pet'r's Mot. for Partial Summ. J. 25. Of course, the Commissioner is not required to make his internal rules and procedures practical (although that may be advisable).[32] Nevertheless, we reject Mr. Smith's contention on the basis that mutual delegations of authority are not only permissible, but occur regularly. For example, section 7701(a)(12)(A)(i) provides for the possibility of "one or more" delegations of authority and, as the Commissioner points out, citing IRM 8.13.1.2.4.1(3) as an example, multiple officials often are authorized to execute closing agreements. Moreover, concurrent delegations of authority need not be express. *See Winslow v. Commissioner*, 139 T.C. 270, 274 (2012) (stating that higher grade IRS personnel hold the same delegated authority as lower grade IRS personnel); *see also Muncy v. Commissioner*, 890 F.3d 724, 726 (8th Cir. 2018) (same), *aff'g* T.C. Memo. 2017-83.

---

Director, Treaty Administration, may not execute a closing agreement under any circumstances.

[31] The parties generally cite to Delegation Order 8-3 at IRM 1.2.2.9.3, where it appeared when the parties filed their motions. But when Ms. Palacheck signed the 2016–18 Closing Agreement in 2017, Delegation Order 8-3 appeared at IRM 1.2.47.4 (Oct. 14, 2014).

[32] In 1974, the IRS Chief Counsel considered a similar issue concerning the authority of certain revenue agents to make determinations and computations under section 446(b) (regarding the Secretary's authority to change a taxpayer's method of accounting to recompute taxable income in a manner that clearly reflects income). Citing an indirect delegation order, parol evidence, the revenue agents' job descriptions, and principles of administrative law, the Chief Counsel determined that the revenue agents had an implied authority to make section 446(b) determinations and computations even though the Internal Revenue Manual did not contain a specific delegation order delegating that authority. The Chief Counsel concluded his memorandum by recommending that the delegation order at issue be "redrafted in broader language" to "avoid the problem" in the future. IRS Gen. Couns. Mem. 35,814 (May 10, 1974). That advice might be helpfully followed here as well.

c.    *Other Considerations*

Our analysis above is further supported by the presumption of official regularity.  *See, e.g.*, *Mecom v. Commissioner*, 101 T.C. 374, 388 (1993) (concluding that an official had authority to sign a consent to extend the limitations period when officials with the same title regularly executed such agreements and noting that "public officials are presumed to have properly discharged their official duties"), *aff'd*, 40 F.3d 385 (5th Cir. 1994); *Perlmutter v. Commissioner*, 44 T.C. 382, 399 (1965) ("[W]e must start with the premise that 'Acts done by a public officer "which presuppose the existence of other acts to make them legally operative, are presumptive proofs of the latter."'" (quoting *R.H. Stearns Co. of Bos., Mass. v. United States*, 291 U.S. 54, 63 (1934))), *aff'd*, 373 F.2d 45 (10th Cir. 1967); *see also, e.g.*, *Riggs Nat'l Corp. & Subs. v. Commissioner*, 295 F.3d 16, 20 (D.C. Cir. 2002) ("The presumption [of official regularity] . . . applies to the actions of tax officials and in applying United States tax law.  Most pertinently, it [also] applies to the actions and records of foreign public officials." (citations omitted)), *rev'g and remanding* T.C. Memo. 2001-12.  Here, U.S. officials charged with applying the 1982 Treaty determined that difficulties or doubts existed concerning its application to Pine Gap employees, and they coordinated with their Australian counterparts to resolve those difficulties or doubts.  We are not inclined to question their judgment in this regard in the absence of any indication that they acted inappropriately.  *See Pietanza v. Commissioner*, 92 T.C. 729, 739 (1989) (citing *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)), *aff'd without published opinion*, 935 F.2d 1282 (3d Cir. 1991).  And Mr. Smith has presented no evidence here to rebut the presumption.[33]    *See, e.g.*, *Riggs Nat'l Corp. v. Commissioner*, 295 F.3d at 21 ("While not irrebuttable, [the] presumption [of regularity] may only be rebutted through clear or specific evidence.").

Finally, comity considerations support the conclusion we reach here.  Mr. Smith and the IRS are not the only stakeholders in this case.  Invalidating this closing agreement for lack of proper approval would

---

[33] In upholding a decision denying a taxpayer's claim for refund, the Supreme Court observed that "the presumption of official regularity was sufficient to sustain the inference that the Commissioner on his side had done whatever was appropriate to give support to his own act."  *R.H. Stearns Co.*, 291 U.S. at 63; *see also United States v. Ahrens*, 530 F.2d 781, 785, 787 (8th Cir. 1976) (applying the presumption of official regularity to hold valid a notice of deficiency, reversing the judgment of the lower court and remanding with instructions to enter summary judgment in favor of the government).

upset the settled expectations of a treaty partner of the United States. To relinquish Australia's right to require Pine Gap employers to withhold tax, the Australian competent authority sought—and the United States competent authority agreed to provide—closing agreements like the one at issue here. According to the record, the Australian Taxation Office permitted Raytheon not to withhold tax from Mr. Smith because it (reasonably) believed that the Commissioner had validly executed a closing agreement and Mr. Smith had irrevocably given up his section 911 exemption and would be taxed by the United States. Australia is entitled to rely on the deal it struck with the U.S. competent authority, as reflected in the closing agreement. Australia's detrimental reliance was fully justified. There would be no reason for the Australian competent authority to question Ms. Palacheck's authority to sign the closing agreement here in light of the treaty-related issues that the overall arrangement resolved and her role as the Director, Treaty Administration. In that role, she was one of the U.S. officials with whom the Australian Taxation Office regularly negotiated to resolve 1982 Treaty issues. It would be untenable for us to now invalidate the closing agreement on the novel theory that the IRS official with whom the Australian tax authorities regularly negotiate could not sign the agreement. We do not read either the 1982 Treaty or Delegation Order 4-12 to produce such a nonsensical result.

In summary, we are unpersuaded by Mr. Smith's arguments regarding Ms. Palacheck's purported lack of authority as Director, Treaty Administration, to execute the 2016–18 Closing Agreement, and Mr. Smith advances no other arguments regarding the validity of the execution of the 2016–18 Closing Agreement. We therefore conclude that the agreement was validly executed.

### B. *Absence of Malfeasance or Misrepresentation of Fact*

We consider next whether the 2016–18 Closing Agreement can be set aside because of "a showing of fraud or malfeasance, or misrepresentation of a material fact." *See* I.R.C. § 7121(b). Mr. Smith alleges both malfeasance and misrepresentation. We conclude neither ground supports setting aside the agreement.

#### 1. *Malfeasance*

Mr. Smith's malfeasance arguments primarily concern the procedures that the IRS, Raytheon, and Raytheon employees used to execute closing agreements. In essence, Mr. Smith maintains that the

IRS committed malfeasance by disclosing confidential return information in violation of section 6103 during each of the following three phases: (1) when providing blank form closing agreements to Raytheon, (2) when receiving the half-executed 2016–18 Closing Agreement through Raytheon, and (3) when transmitting the fully executed 2016–18 Closing Agreement back to Mr. Smith through Raytheon. Each argument implicates questions of first impression.

a. *Malfeasance, Generally*

We begin with some background on the type of malfeasance that counts for setting aside a closing agreement. The predecessor to our Court declined to set aside a closing agreement absent malfeasance "in the making of the agreement." *Ingram v. Commissioner*, 32 B.T.A. 1063, 1065 (1935), *aff'd per curiam*, 87 F.2d 915 (3d Cir. 1937). Memorandum opinions of our Court have acknowledged the same rule. *See, e.g.*, *Halpern v. Commissioner*, T.C. Memo. 2000-151, 2000 Tax Ct. Memo LEXIS 180, at *8–9 (noting that the Court had previously denied the Commissioner's motion for summary judgment because there was a factual dispute as to whether the Commissioner "committed malfeasance . . . in obtaining the closing agreement"), *aff'd*, 33 F. App'x 550 (2d Cir. 2002); *Bennett v. Commissioner*, T.C. Memo. 1988-557, 1988 Tax Ct. Memo LEXIS 586, at *6, *9 (stating that a closing agreement may be set aside if the parties "were induced to sign" or the agreement was "obtained through" fraud or misrepresentation and leaving for trial the question of whether the relevant standard was met on the facts there).[34]

Malfeasance is not defined in the Code or the Treasury Regulations. According to Black's Law Dictionary, it is a "wrongful, unlawful, or dishonest act; esp., wrongdoing or misconduct by a public official." *Malfeasance, Black's Law Dictionary* 1145 (11th ed. 2019).[35]

---

[34] *See also Tree-Tech, Inc. v. Commissioner*, T.C. Memo. 2011-162, 2011 Tax Ct. Memo LEXIS 161, at *12–13 (describing when closing agreements may be set aside and holding that the taxpayer had "not set forth any specific facts that would create a genuine issue for trial as to fraud, malfeasance, or misrepresentation of a material fact").

[35] In *H Graphics/Access, Ltd. P'ship v. Commissioner*, T.C. Memo. 1992-345, 1992 Tax Ct. Memo LEXIS 367, the Court was called upon to interpret section 6224(c) as in effect in 1987. That section, which was repealed in 2015, "provide[d] that settlement agreements in unified partnership proceedings are binding absent a

b.    *Disclosure of Confidential Return Information*

Subject to exceptions set out in the Code, section 6103(a)(1) prohibits an "officer or employee of the United States" from "disclos[ing] any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise." *See Mescalero Apache Tribe v. Commissioner*, 148 T.C. 291, 294 (2017).  A "disclosure" is defined as the "making known to any person in any manner whatever a return or return information." I.R.C. § 6103(b)(8).  Return information includes, among other things, "[1] any agreement under section 7121, and [2] any similar agreement, and [3] any background information related to such an agreement or request for such an agreement." I.R.C. § 6103(b)(2)(D).[36]

The definition of "return information" is "'deliberately sweeping' . . . in order to effectuate the statute's core purpose of protecting taxpayer privacy," *Sea Shepherd Conserv. Soc'y v. IRS*, 208 F. Supp. 3d 58, 86 (D.D.C. 2016) (first quoting *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1135–36 (D.C. Cir. 2001); and then quoting *Tax Analysts v. IRS*, 117 F.3d 607, 615 (D.C. Cir. 1997)), and "to encourage . . . taxpayers' free and open disclosure to the [IRS]," *Estate of Yaeger v. Commissioner*, 92 T.C. 180, 184 (1989) (citing *Lampert v. United States*, 854 F.2d 335, 336 (9th Cir. 1988)).  But return information "does not include data in a form [that] cannot be associated with, or otherwise

---

showing of 'fraud, malfeasance, or misrepresentation of fact.'" *Id.* at \*17 (quoting section 6224(c)).  The Court observed that "[t]he standard that section 6224(c) prescribe[d] for setting aside a settlement agreement [was] the same standard prescribed by section 7121(b) for setting aside a closing agreement." *Id.* at \*18.  After reviewing dictionary "definitions, case law, and perceived congressional intent," the Court held "that the terms 'malfeasance' and 'misrepresentation' [as used in section 6224(c)] require a deliberate intent to deceive or mislead similar to that required to prove fraud." *Id.* at \*22 (footnotes omitted).

[36] The more expansive portion of the "return information" definition is contained in section 6103(b)(2)(A).  It includes:

> a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense . . . .

identify, directly or indirectly, a particular taxpayer." I.R.C. § 6103(b)(2) (flush text).

Congress has established criminal penalties and civil causes of action for violations of section 6103.[37] For purposes of our Opinion, we assume without deciding that willful disclosure of confidential return information in violation of section 6103 is an act of malfeasance for purposes of section 7121(b). But even with that assumption, as discussed below, we find no malfeasance "in the making of" the 2016–18 Closing Agreement either because no return information was disclosed in contravention of section 6103 or because any inappropriate disclosure did not affect the making of the agreement.

> c. *Phase One: Whether There Was Malfeasance in Providing a Blank Closing Agreement to Raytheon*

We can easily dispense with Mr. Smith's first argument—that malfeasance occurred when "[t]he IRS sent the [form] [c]losing [a]greement to Raytheon" because the blank, form closing agreement (form agreement) was return information under section 6103(b)(2)(D). Pet'r's Mot. for Partial Summ. J. 26. The argument fails for at least three reasons.

> i. *Not Covered by 6103(b)(2)(D)*

First, the form agreement does not come within the definition of "return information" set out in section 6103(b)(2)(D). That provision covers three categories of information: (1) "any agreement under section 7121," (2) "any similar agreement," and (3) "any background information related to such an agreement or request for such an agreement."

---

[37] In particular, section 7213(a)(1) makes it "unlawful for any officer or employee of the United States . . . , or any former officer or employee, willfully to disclose to any person, except as authorized in this title, any return or return information (as defined in section 6103(b))." A violation of section 7213(a)(1) is "a felony punishable upon conviction by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both." *See also* I.R.C. § 7213A (making it unlawful for any officer or employee of the United States willfully to inspect, except as authorized in the Code, any return or return information and making any violation punishable "by a fine in any amount not exceeding $1,000, or imprisonment of not more than 1 year, or both"); I.R.C. § 7431(a)(1) (permitting taxpayers to bring a civil action for damages against the United States for violations of section 6103).

With respect to the first two categories, an unsigned, blank agreement is not an "agreement under section 7121" because it has not been adopted by any party. Nor is it a "similar agreement." Indeed, it is not an agreement at all. Petitioner's argument therefore fails to the extent that it depends on the first two categories.

With respect to the third category, it should go without saying that an officer or employee of the United States does not violate section 6103 if the information disclosed is not a "return" or "return information" at the time of the disclosure. As applicable here, at the time the IRS sent the form agreement to Raytheon, no closing agreement was in effect with Mr. Smith for the tax years 2016–18, and Mr. Smith had not requested a closing agreement for those years. (In fact, Mr. Smith maintains he never requested a closing agreement before Raytheon presented one to him.) Accordingly, at the time the IRS "disclosed" the form agreement to Raytheon, it was not "background information" related to the 2016–18 Closing Agreement or to a request by Mr. Smith for such an agreement.

Mr. Smith appears to argue that the form agreement was either a request by the IRS that Mr. Smith enter into a closing agreement for the relevant years or at least "background information" related to such a request. Given the overall focus of section 6103 on information provided by taxpayers to the IRS, *see, e.g.*, I.R.C. § 6103(a) (flush text), we are skeptical that section 6103(b)(2)(D) covers information flowing in the opposite direction.[38] But even if we were to assume for the sake of analysis that section 6103(b)(2)(D) encompasses a request by the IRS for a closing agreement, the record here shows that the IRS did not make such a request. Rather, the creation of the form agreement simply reflected an IRS determination (after consultation with the Australian Taxation Office) that taxpayers interested in entering into a closing agreement would have the option to do so. And when the IRS transmitted the form agreement to Raytheon, it was simply outlining one form taxpayer offers can take to be considered by the IRS.

To summarize, the IRS did not ask Mr. Smith (or any other taxpayer) to enter into a closing agreement when it transmitted the form agreement to Raytheon. The form agreement, therefore, was not an IRS

---

[38] Stated differently, it is not readily apparent that section 6103(b)(2)(D) covers either requests to enter into a closing agreement made by the IRS or any background information relating to such a request (provided the request does not otherwise contain return information, such as that described in section 6103(b)(2)(A)).

request for a closing agreement, nor was it background information related to such a request.[39] As a result, Mr. Smith's argument fails to the extent it depends on the third enumerated category in section 6103(b)(2)(D).

### ii. *Not Associated with Any Taxpayer*

In addition to not falling within the definition of "return information" in section 6103(b)(2)(D), the form agreement appears to be specifically excluded from the definition of "return information" by the flush text of section 6103(b)(2). That text provides that the term "return information" "does not include data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer." *Cf. Sklar v. Commissioner*, 282 F.3d 610, 617 (9th Cir. 2002) (suggesting that even a final closing agreement may be subject to disclosure if it "affect[s] not just one taxpayer or a discrete group of taxpayers, but a broad and indeterminate class of taxpayers with a large and constantly changing membership").

In this respect, the form agreement is similar to guidance the IRS has issued regarding closing agreements in other contexts where taxpayers share common fact patterns. *See, e.g.*, IRM 7.2.3.1–4 (Jan. 7, 2020) (describing the Tax Exempt Bonds Voluntary Closing Agreement Program);[40] IRM 4.23.25.1 (Aug. 3, 2018) (describing a voluntary closing agreement process for employment tax matters). These programs provide options for taxpayers who wish to resolve potential compliance issues proactively. They do not identify individual taxpayers or otherwise convey sensitive information. And taxpayers are not required to participate in them.

Mr. Smith admits that such programs are permissible and attempts to distinguish this case because of the Commissioner's provision of form closing agreements to Raytheon (a third party) rather than posting them on its website. But if disclosure to the whole world

---

[39] We need not decide for purposes of this discussion whether the provision covers only "background information related to such . . . request[s] for such . . . agreement[s]," as the text appears to suggest, or whether "requests" for closing agreements constitute a separate category under section 6103(b)(2)(D), as Mr. Smith appears to argue, because the result here would be the same under either reading.

[40] Model closing agreements for the Tax Exempt Bonds Voluntary Closing Agreement Program are posted on the IRS's website. *See Model Closing Agreements for VCAP and Examinations*, https://www.irs.gov/tax-exempt-bonds/model-closing-agreements-for-vcap-and-examinations (last updated Aug. 6, 2022).

is permissible, we see nothing in section 6103 prohibiting disclosure to a single third party. And we find some of Mr. Smith's contentions on this score rather strained.[41]

In short, the form agreement—like other model closing agreements posted on the IRS's website—contained no identifying data or other sensitive information at all.[42] Instead, it merely contained interpretive legal statements regarding the generalized application of tax treaties, international agreements, and domestic tax laws. The IRS did not require Raytheon employees to sign the agreements, and there was no guarantee that the IRS would countersign even if an employee did sign. Therefore, the form agreement "[did] not include data in a form which [could] be associated with, or otherwise identify, directly or indirectly, a particular taxpayer." *See* I.R.C. § 6103(b)(2).

### iii. *Not Obtained by the IRS*

Finally, our conclusions are confirmed by the text of section 6103(a). That provision prohibits the disclosure of return information that was "obtained by [an IRS official] in any manner in connection with his service." The form agreement was not return information "obtained" by any IRS officials; it was a document created by IRS officials in the ordinary course of their duties and did not include, nor was it premised upon, any particularized underlying information obtained from any specific taxpayer. In these circumstances, section 6103 simply is not implicated. Nor does finding section 6103 inapplicable here in any way hinder "effectuat[ing] the statute's 'core purpose' of 'protecting taxpayer privacy,'" *Sea Shepherd Conserv. Soc'y*, 208 F. Supp. 3d at 86 (quoting *Tax Analysts*, 117 F.3d at 615), or

---

[41] At the hearing, for example, Mr. Smith's counsel appeared to endorse the view that section 7431(a) would authorize every Pine Gap employee whose employer had received the form agreement to bring a civil action for damages against the United States for violations of section 6103, even if that employee never entered into a closing agreement.

[42] We note that the U.S. Supreme Court in *Church of Scientology of Cal. v. IRS*, 484 U.S. 9, 14 (1987), held that even though the direct or indirect identifiers may be removed from documents constituting return information, the documents still retain their protected character under section 6103. However, *Church of Scientology* does not apply to a document that was never return information in the first place, such as a blank form closing agreement or any other blank tax form. Here, no identifiers were removed from the form agreement because none were ever in the form agreement.

discourage "taxpayers' free and open disclosure to the [IRS]," *Estate of Yaeger*, 92 T.C. at 184 (citing *Lampert*, 854 F.2d at 336).

Based on the foregoing, we conclude that the provision of the form agreement to Raytheon did not violate section 6103 as alleged, nor did it constitute malfeasance.

> d. *Phase Two: Whether There Was Malfeasance in Obtaining the 2016–18 Closing Agreement Through Raytheon*

Next, Mr. Smith argues that "the IRS . . . violated [section] 6103(a) when [it] obtained the [2016–18] Closing Agreement through [Raytheon]." Pet'r's Mot. for Partial Summ. J. 29.

After completing and signing the 2016–18 Closing Agreement, Mr. Smith provided the executed document to Raytheon, which in turn provided it to the IRS. But any disclosure that resulted from that action—for example, of the information Mr. Smith himself printed on the agreement (including his name, address, and Social Security number)—was attributable to Mr. Smith and not to the IRS. As Mr. Smith's counsel conceded at the hearing, "[a] taxpayer may disclose his own tax information." *United States v. Richey*, 924 F.2d 857, 863 (9th Cir. 1991) (citing *United States ex rel. Carthan v. Sheriff, City of New York*, 330 F.2d 100, 101 (2d Cir. 1964)); *see also Carthan*, 330 F.2d at 101 ("Disclosure by the taxpayer himself of his copies of returns is not an unauthorized disclosure . . . ."); *Bancroft Global Dev. v. United States*, 330 F. Supp. 3d 82, 97–99 (D.D.C. 2018) (taxpayers' sharing of own return information not a disclosure under section 6103).

We fail to see how an action taken by Mr. Smith himself, in the absence of any affirmative action whatsoever by the IRS, could violate section 6103. The IRS did not disclose anything when Mr. Smith submitted the half-signed agreement; it merely received the document from Raytheon, which had received it from Mr. Smith.[43] We therefore

---

[43] Mr. Smith does not allege that the 2016–18 Closing Agreement should be set aside because of malfeasance on the part of Raytheon in disclosing return information. Therefore, we will not consider the effect on the enforceability of the 2016–18 Closing Agreement, if any, of Raytheon's transmission of the 2016–18 Closing Agreement to and from the IRS. *See Rowen*, 156 T.C. at 115–16 (legal argument not raised in motion for summary judgment considered forfeit). But we note that some courts have held that third-party transmissions of return information are not "disclosures" within the meaning of section 6103(a). *See Shell Petrol., Inc. v. United States*, 46 Fed. Cl. 719,

conclude that the IRS's receipt of the half-signed 2016–18 Closing Agreement from Raytheon did not violate section 6103 and does not constitute malfeasance.

> e.     *Phase Three: Whether There Was Malfeasance in Transmitting the 2016–18 Closing Agreement to Mr. Smith via Raytheon*

The final portion of Mr. Smith's argument—that malfeasance occurred when the IRS sent the fully executed 2016–18 Closing Agreement back to Raytheon—is preempted by the execution of the agreement itself. Mr. Smith cannot be said to have been induced into executing the 2016–18 Closing Agreement by an action taken *after* the agreement had become "final and conclusive" under section 7121. Any malfeasance occurring after the validity (and finality) of a closing agreement is established is no ground to set it aside. *See Ingram*, 32 B.T.A. at 1065 (stating that a closing agreement may be set aside because of malfeasance occurring in the making of the agreement).

In short, whether the IRS's disclosure of the fully executed agreement to Raytheon violated section 6103 is immaterial because it occurred after the 2016–18 Closing Agreement became final and conclusive. Therefore, we express no view as to whether this disclosure would or would not be prohibited under section 6103.[44]

---

722 (2000) ("Section 6103 does not prohibit the disclosure of tax return information that comes from a source other than the IRS." (citing *Baskin v. United States*, 135 F.3d 338, 342 (5th Cir. 1998))); *see also Stokwitz v. United States*, 831 F.2d 893, 895 (9th Cir. 1987) ("Section 6103 establishes a comprehensive scheme for controlling the release *by the IRS* of information received from taxpayers . . . ."); *Jade Trading, LLC v. United States*, 65 Fed. Cl. 188, 194–95 (2005) (stating that the legislative history of section 6103 "further indicates that [s]ection 6103 only prohibits disclosure by IRS personnel"); *cf. Lomont v. O'Neill*, 285 F.3d 9, 15 (D.C. Cir. 2002) (holding that an individual's provision of his own information to state and local officials before filing a return was not a disclosure of return information for purposes of section 6103).

[44] For example, we need not consider whether one of the myriad exceptions to section 6103 would apply in this situation.

## 2. *Misrepresentation of Material Fact*

Mr. Smith also argues that the 2016–18 Closing Agreement should be set aside because it contained material misrepresentations in its recitals.[45] The recitals state, in relevant part, as follows:

> Whereas, any wages, allowances, benefits and other emoluments paid or provided to [Mr. Smith] as consideration for services performed for [Raytheon] in Australia, hereinafter referred to as income, are subject to taxation by the Government of the Commonwealth of Australia; and

> Whereas, Article 9 and Article X of [Pine Gap I and Pine Gap II, respectively] . . . provide that such income shall be deemed not to have been derived in Australia, provided it is not exempt, and is brought to tax, under the taxation laws of the United States.

Mr. Smith asserts that the first recital is a "material misstatement" because, he argues, regardless of whether he elects under section 911(a), Australian domestic tax law provides an independent exemption for income earned by U.S. citizens employed at Pine Gap. Mr. Smith further asserts that the second recital is a misrepresentation because the Pine Gap Agreements "do[] not govern tax liability in Australia." Pet'r's Mot. for Partial Summ. J. 34. He urges this Court to set aside the 2016–18 Closing Agreement because, in his view, these two recitals, taken together, induced his execution of the agreement by representing that "the execution of the [2016–18] Closing Agreement and foregoing a domestic U.S. tax right is required to avoid Australian taxation."[46] *Id.*

---

[45] We note that, although recitals in a closing agreement are not binding, they are nevertheless explanatory and give insight into the intent of the parties. *Analog Devices, Inc. & Subs. v. Commissioner*, 147 T.C. 429, 446 (2016); *Estate of Magarian v. Commissioner*, 97 T.C. 1, 5 (1991); Rev. Proc. 68-16, § 6.05(2) and (3), 1968-1 C.B. at 779.

[46] Mr. Smith also asserts that a third recital contains a misrepresentation. That recital states:

> Whereas, such waiver is pursuant to an agreement with and a determination by the Competent Authority for the United States after consultation with the Competent Authority for Australia in accordance with Article 24 of the [1982 Treaty].

a. *Legal Background*

Section 7121 provides that a closing agreement may be set aside upon a showing of fraud or a misrepresentation of material fact. I.R.C. § 7121(b).[47] Mr. Smith has not alleged fraud.[48]

In general, "a misrepresentation is an assertion that is not in accord with the facts," and is "material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so."[49] Restatement (Second)

_____

In Mr. Smith's view, the recital is inaccurate because he did not initiate any competent authority proceedings under Article 24 of the 1982 Treaty and the United States and Australian competent authorities did not conduct any such proceedings with respect to him. But Mr. Smith misreads the recital. The recital does not state that formal competent authority proceedings involving negotiations between the two countries were conducted with respect to him. The recital simply notes that the waiver of Mr. Smith's rights under section 911(a) is being made pursuant to "an agreement with . . . the Competent Authority for the United States." That statement is entirely true given that the IRS official who reviewed and signed the agreement, Ms. Palacheck, served as the U.S. Competent Authority with respect to the relevant issues. Moreover, the statement that the waiver is "pursuant to . . . a determination by the Competent Authority for the United States" is also true for the same reason. Finally, as the Welch Letter explains, the procedure the IRS follows when entering into closing agreements with Pine Gap employees was developed in consultation with the Australian competent authority following the process Article 24 of the 1982 Treaty provides. So that statement in the recital is also true. In short, Mr. Smith attributes to the recital what the recital does not say. Accordingly, we find no misrepresentation of any sort in this recital.

[47] Cases, including memorandum opinions of this Court, have held that, in determining whether a closing agreement will be set aside, the usual rules as to fraud and misrepresentation apply. *See, e.g.*, *Bennett*, 1988 Tax Ct. Memo LEXIS 586, at *9 (citing *Basch v. Nauts*, 4 U.S.T.C. para. 1,342 (N.D. Ohio 1934)); *Estate of Mitchell v. Commissioner*, T.C. Memo. 1993-110, 1993 Tax Ct. Memo LEXIS 126, at *5 (citing *Bennett*, 1988 Tax Ct. Memo LEXIS 586).

[48] In general, fraud must be affirmatively alleged and the party alleging fraud must state with particularity the circumstances giving rise to it. *See* Rule 1(b) (giving particular weight to the Federal Rules of Civil Procedure absent an applicable provision in the Tax Court Rules of Practice and Procedure); Fed. R. Civ. P. 8(c)(1), 9(b).

[49] We note that, in addition to the materiality requirement, the predecessor to our Court has held that "misrepresentation denotes something more deliberate or more conscious than mere error or mistake." *See Ingram*, 32 B.T.A. at 1066. We therefore have required in certain contexts a showing that the alleged misrepresentation was intentional and deliberate. *See H Graphics/Access, Ltd. P'ship*, 1992 Tax Ct. Memo LEXIS 367, at *25 (noting in a case involving a settlement agreement under section 6224(c) that the Court has found "the deliberate intent to deceive or mislead" to be "a

of Conts. §§ 159, 162 (Am. L. Inst. 1981). However, by the plain language of section 7121(b), we may set aside a closing agreement only in the event of a misrepresentation of material *fact*. Neither mistake nor misrepresentation of law provides a viable path to parties seeking to set aside a closing agreement. *See Zaentz v. Commissioner*, 90 T.C. 753, 761–62 (1988) (stating that mistakes of fact and law are not grounds for rescission of a closing agreement); 26 Richard A. Lord, Williston on Contracts (Williston), § 69:10 (4th ed. 2022) ("It is well settled that a claim of fraud in the making of a contract cannot generally be supported by proof of misstatements as to matters of law.").

b.    *Analysis*

Taking in turn the two recitals to which Mr. Smith objects, the first recital is a legal conclusion regarding the application of U.S. treaty obligations and Australian domestic law to U.S. employees at Pine Gap, while the second is an entirely accurate statement of the express terms of Pine Gap I and Pine Gap II. Neither qualifies as a misrepresentation of material fact as required by section 7121.[50]

At the hearing, Mr. Smith's counsel espoused the view that, although the statements made in the recitals are of a legal nature, legal conclusions and factual assertions are not mutually exclusive—i.e., they can be one and the same. She offered no authority to support this contention.

---

necessary element of fraud, malfeasance, or misrepresentation within the meaning of section 6224(c)"); *see also Hopkins*, 120 T.C. at 461 n.15 (stating that the standard prescribed for setting aside a settlement agreement is the same standard prescribed for setting aside a closing agreement (citing *H Graphics/Access, Ltd. P'ship*, 1992 Tax Ct. Memo LEXIS 367)). But given our conclusions regarding the nature of the recitals at issue, we need not address this potential additional requirement.

[50] For purposes of analyzing the Commissioner's Motion, we assume without deciding that the first recital expresses an erroneous legal conclusion, as Mr. Smith contends. We note, however, that in public guidance drafted in coordination with the Australian Taxation Office, the Commissioner maintains the view that employees at Pine Gap are subject to Australian Taxation. *See Foreign Earned Income Exclusion and the Pine Gap Facility*, https://www.irs.gov/individuals/international-taxpayers/foreign-earned-income-exclusion-and-the-pine-gap-facility (last updated Feb. 15, 2022). And in its own published guidance, the Australian Taxation Office appears to share the Commissioner's understanding. *See Australia-United States Joint Space and Defence Projects*, https://www.ato.gov.au/Business/International-tax-for-business/In-detail/Australian-income-of-foreign-residents/Australia-United-States-Joint-Space-and-Defence-Projects/?page=1#Project_employment_income (stating the same rule and linking to the IRS Q&A) (last modified June 10, 2022).

That there is a distinction between statements of law and statements of fact is a longstanding principle of law generally, and of contract law specifically. *See, e.g.*, *Kemp v. United States*, 142 S. Ct. 1856, 1862 (2022) (stating that "[t]he difference between 'mistake of fact' and 'mistake of law' was well known" in the 1930s and 1940s); 26 Williston § 69:10 (describing the distinction); 27 Williston § 70:125 (same); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 608 (2010) (Scalia, J., concurring in part and concurring in the judgment) ("[T]here is a long tradition in the common law and in our construction of federal statutes distinguishing errors of fact from errors of law.").

Although this distinction has, generally speaking, eroded over time in the context of equitable rescission of contracts, 27 Williston § 70:125 ("[M]odern contract law does not distinguish between mistakes of fact and mistakes of law, but treats both alike for purposes of equitable relief."), this case is not governed by equitable principles, *see* Discussion Part II. We cannot assume, given the longstanding distinction between the two concepts, that Congress intended to include misrepresentations of *law* when it specifically set forth only misrepresentation of material *fact* as a ground for rescission in section 7121(b). *See Kemp*, 142 S. Ct. at 1862 (attributing significance to the "unqualified" use of the term "mistake" when "drafters had at their disposal readily available language that could have connoted a narrower understanding" of the term); *see also Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) ("Had Congress intended [an alternative meaning], it easily could have drafted language to that effect.").

Had Congress provided that a closing agreement could be set aside in case of a material misrepresentation of fact or law, or in case of a material misrepresentation (without qualification), Mr. Smith's position might be more plausible. But, perhaps unsurprisingly given that a purpose of closing agreements is to provide finality in the face of unsettled law, Congress did not write the statute that way. *See Aetna Life Ins. Co.*, 43 F.2d at 714 (citing the importance of finality and holding that a closing agreement continued to be valid even when a provision of the statute on which it was based was later found unconstitutional). And we are unpersuaded by Mr. Smith's arguments.

### 3. *Duress*

Finally, Mr. Smith argues in his Petition that the 2016–18 Closing Agreement should be set aside because he signed it under duress. He briefly mentions this argument in his Cross Motion for Partial Summary Judgment, stating that he "was presented with [an earlier] [c]losing [a]greement on his first day at work . . . and was forced to sign [it] on the spot." Pet'r's Mot. for Partial Summ. J. 27. And he further argues in his Opposition to Respondent's Motion for Partial Summary Judgment that the IRS's malfeasance placed Raytheon "in a position of power to apply duress." Pet'r's Opp'n to Resp.'s Mot. for Partial Summ. J. 9.

Given the cursory nature of these assertions, Mr. Smith forfeited any duress arguments by not fully briefing them in his motion papers. *See Rowen*, 156 T.C. at 115–16 (collecting authorities); *see also* Rule 121(d); *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990))).

Nevertheless, on the basis of the undisputed facts and construing factual materials and inferences drawn from them in Mr. Smith's favor, we note for completeness that the 2016–18 Closing Agreement was the third closing agreement Mr. Smith signed, and he signed it long after he first arrived in Australia, having had much time to reflect on whether he should sign another one. And we doubt that even the circumstances under which Mr. Smith signed his first closing agreement qualified as duress.

In the context of signing returns, "[t]he standard [for duress], as developed, involves two critical elements: (1) Whether the taxpayer was unable to resist demands to sign the return; and (2) whether '[he] would not have signed the returns except for the constraint applied to [his] will.'" *Brown v. Commissioner*, 51 T.C. 116, 119 (1968) (quoting *Stanley v. Commissioner*, 45 T.C. 555, 562 (1966)). Put another way, the taxpayer "must show not only that [he] had no choice in [signing the return] but also that [he] was 'reluctant' to do so." *Id.*

Duress includes "actions by one party [that] deprive another of his or her freedom of will to do or not to do a specific act." *Zapara v. Commissioner*, 124 T.C. 223, 229 (2005) (citing *Diescher v. Commissioner*, 18 B.T.A. 353, 358 (1929)), *aff'd*, 652 F.3d 1042 (9th Cir. 2011), and *Price*

*v. Commissioner*, T.C. Memo. 1981-693, *aff'd without published opinion*, 742 F.2d 1460 (7th Cir. 1984)).

> [I]f there be compulsion, there is no actual consent, and moral compulsion, such as that produced by threats to take life or to inflict great bodily harm, as well as that produced by imprisonment, is everywhere regarded as sufficient, in law, to destroy free agency, without which there can be no contract, because, in that state of the case, there is not consent.
>
> Duress, in its more extended sense, means that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient, in severity or in apprehension, to overcome the mind and will of a person of ordinary firmness.

*Furnish v. Commissioner*, 262 F.2d 727, 733 n.6 (9th Cir. 1958) (quoting *Brown v. Pierce*, 74 U.S. 205, 214 (1868)), *aff'g in part, rev'g in part* 29 T.C. 279 (1957). By contrast, legally authorized actions that limit another to choosing between undesirable options do not constitute duress.[51]

Mr. Smith concedes that he had no interaction with any IRS official prior to executing the 2016–18 Closing Agreement, so we find it hard to see how the Commissioner might have placed him under duress. For Raytheon's part, requiring Mr. Smith to sign a closing agreement as a condition of employment is its prerogative as the employer (and the statements contained in its Australian Operations Overseas Handbook—*see* Background Part III.A above—suggest that it may not have been a condition of employment in any event). Moreover, Raytheon warned Mr. Smith multiple times before he even moved to Australia about potential tax complexities associated with its offer and advised him to obtain tax advice. Raytheon's later request that Mr. Smith choose between the consequences of signing or not signing the 2016–18 Closing Agreement—i.e., between maintaining or losing his job at Raytheon—at most required a choice between two undesirable options, making it difficult to see how it constituted duress. In any event, we

---

[51] *See Hall v. Commissioner*, T.C. Memo. 2013-93, at *12; *see also Evert v. Commissioner*, T.C. Memo. 2022-48, at *7.

need not decide this issue, because, as already noted, Mr. Smith forfeited any duress arguments by not fully briefing them.

IV.    *Conclusion*

We conclude that the 2016–18 Closing Agreement is valid and enforceable because (1) it was signed by an official with the requisite authority, (2) there was no malfeasance in the making of the agreement, and (3) the recitals are not misrepresentations of material fact. We have considered all of the arguments of the parties, and to the extent not discussed herein, we find them moot, irrelevant, or without merit. We will therefore grant the Commissioner's Motion for Partial Summary Judgment and deny Mr. Smith's competing Motion.

To reflect the foregoing,

*An appropriate order will be issued.*